DODGE *v.* NORTH END IMPROVEMENT ASSOCIATION.

1. INJUNCTION — EQUITY — PARKS — CONVEYANCES—INAPPROPRIATE USE—DEDICATION—REMEDIES.

Equity will interfere, at the instance of an adjacent proprietor, to restrain a city from making unlawful use of property dedicated by the original owner as a park, with the express limitation that no other use should be made of it, provided that the municipality makes use thereof in any manner not intended, and inappropriate for a public park.

2. MUNICIPAL CORPORATIONS—PARK—PAVILION.

A pavilion erected in a park to serve the purpose of a waiting room for cars and of shelter for those who made use of the park, and as a refreshment stand, and properly situated therefor, did not invade the limitations of the dedication whereby it was expressly stipulated that the

property should be used for a public park and for no other purpose.[1]

3. SAME—DEFINITION.

    A public park may be defined as an open or inclosed tract of ground adapted to and set apart for pleasure, recreation, ornament, light and air of the inhabitants of the town in or near which it is located.

Appeal from St. Clair; Law, J. Submitted October 7, 1915. (Docket No. 20.) Decided December 21, 1915.

Bill by Charles K. Dodge against the North End Improvement Association and others for an injunction. From a decree for defendants, complainant appeals. Affirmed.

*Stevens, Graham & Stevens,* for complainant.

*Carl A. Wagner* and *Burt D. Cady,* for defendants.

MOORE, J. In April, 1912, the late Senator Thomas W. Palmer and his wife deeded to the city of Port Huron about 10 acres of land. The deed contained the following language:

"It is provided that the intent and purpose of this indenture is to convey to the city of Port Huron the above-described land and premises to be used only as a public park and for such use only the land above-described is conveyed in perpetuity; which said land is to be improved and properly cared for by the grantee herein, and is hereby dedicated to the use of the public forever. And provided further that nothing in this conveyance contained shall be so construed as to defeat reversion to the grantor or his heirs in case said property should ever be used for any other purpose than that above designated."

The testimony is that the defendant, the North End Improvement Association, is incorporated.

---

[1] As to what use of parks amounts to diversion from the use for which they were dedicated, see notes in 25 L. R. A. (N. S.) 980, 50 L. R. A. (N. S.) 465.

"It was organized for the purpose of improving the north end of the city in any way they could, to put it in a more sanitary condition, and trying to induce the people to keep their premises in a sanitary condition, and to beautify the same."

On July 23, 1912, a communication in writing from the North End Improvement Association to the city commission requested permission to build a pavilion on Palmer Park close to the corner of Garfield street and Gratiot avenue. On August 14, 1912, permission in writing was issued by the city commission to the North End Improvement Association to erect this building on the northeast corner of Gratiot avenue and Garfield street, the building to be 16 feet wide, 30 feet long, and 8 feet in height, and was to conform in construction to a type open-pavilion-class building. The building was started in August, 1912, and was completed in October, 1912.

The complainant owns a house and grounds valued at $5,000 across the street from Palmer Park. He claimed his premises were decreased in value by the erection of the pavilion, that it shut off his view of the river, that it and its surroundings constituted a nuisance, and that it was used simply as a railroad waiting station and was not an adjunct of the park, and filed this bill praying, among other things:

"That the building erected on said park property may be required to be removed. * * * That said premises may be decreed to be used for park purposes only. * * * That your orator may be awarded such damages as it may be shown he has wrongfully sustained. That your orator may have such other and further relief in the premises as equity may require and to your honor may seem meet."

The city filed an answer in which appears the following:

"Says, however, that it understands that the inhabitants of the city located in the vicinity of the said park are greatly interested therein, and proposed to this defendant that for the purpose of promoting the public convenience, safety, and pleasure, and to facilitate the use by the public of the said park, that they would construct thereon with the permission of the city a public waiting room wherein persons resorting to the park might find shelter in the event of rain, inclement weather, or excessive sunshine. That for this purpose this defendant permitted the erection on the southeast corner of said park, adjoining the street railway, of a small structure designed as a waiting room and public shelter. * * * And submits that under the terms of the gift the officials of the city are made the sole judges as to the character and extent of the changes to be made in the said park and as to what modification thereof is best needed to secure the comfort, convenience, and public enjoyment of the aforesaid park. * * *

"This defendant avers that the building so erected is suitable and sufficient for the purposes for which it is constructed; that its location will best serve the convenience of the public."

The improvement association also filed an answer. After a full hearing before a circuit judge who lives at Port Huron, he dismissed the bill of complaint. The case is brought here by appeal.

The trial judge filed an elaborate written opinion, from which we quote:

"During the summer of 1912, the North End Improvement Association promoted a scheme to place a building on the southeast corner of said out-lot 16 for reasons which will presently appear. Gratiot avenue is a part of the main thoroughfare through the city of Port Huron in a northerly and southerly direction. In this street and its extensions is a street railway track upon which are operated electric cars. Garfield street is about two miles north of the center of the business part of the city of Port Huron and about two miles south of the northerly city limits. In the northerly part of the city are located two cemeteries, a large

public park, a private park and resort, and several beaches which are used by many people, both by inhabitants of the city and by strangers, as summer resorts. During some portions of the year only part of the cars of the street railway are operated north of Garfield street; hence, people going from the city to points north of Garfield street frequently have occasion to wait at this street for cars which will carry them to the cemeteries, parks, or resorts in the northerly part of the city. The main object which the North End Improvement Association had in placing the building heretofore mentioned on the southwest corner of lot 16 was to provide a shelter for people who had occasion to wait for cars at Garfield street.

"In the summer of 1912 this association, by voluntary labor and contributions, cleared the ground of shrubs and rubbish, took down an old unsightly post and wire fence, and constructed a one-story building in its dimensions 10 feet north and south and 30 feet east and west, on the southwest corner of lot 16 directly across Gratiot avenue from complainant's residence. A partition was run through this building so that the west end of the building nearest Gratiot avenue is an open pavilion 12 feet by 16 feet in size and in the east end an inclosed room about 18 feet by 16 feet in size. This building was constructed of good materials and neatly painted. It was completed as it now stands when this suit was commenced on June 25, 1913. It was lighted by electric lights. This building was planned and constructed with the full knowledge and approval of the city commission of the defendant city, without cost to the city. The object which inspired the North End Improvement Association to construct this building was to furnish a shelter for people who had occasion to wait at Garfield street for the north-bound street cars to the cemeteries, parks, and resorts located in the northerly part of the city. In order that the building might be looked after properly, the North End Improvement Association placed the defendant Mary I. Thayer in charge of the building and gave her permission to sell light refreshments therein such as are usually sold in public parks, as compensation to her for looking after the building. At the time this bill of complaint was filed, Mrs.

Thayer was in charge of the building selling light refreshments therein.

"It is now contended by both defendants that the building is not only useful as a waiting room for street car passengers, but also for such uses in connection with out-lot 16, called Palmer Park, as a pavilion in a public park is usually serviceable, to furnish a shelter for such pleasure and recreation seekers as come to the park, to furnish refreshment, and to provide a shelter to be used in connection with the ice skating rink which it is contemplated to establish during the cold months.

"Both defendants now claim that the construction of this building is but a preliminary step in the improvement of this park so as to make it available and useful for recreation seekers.

"The North End Improvement Association has also made, under the control of the city officials and with their approval, several improvements to out-lot 16 towards making this lot available and serviceable for park purposes, and I find that all that has been done in this way, including the construction of the building, has been done by the North End Improvement Association at the private expense of the members, and with the approval of the city officials, in the utmost of good faith, and with the object in view of the improving of Palmer Park and the benefiting of the north part of the city of Port Huron, and that these efforts have resulted in improving that park and thus directly benefiting the north part of the city of Port Huron, and indirectly the whole of the city."

The position of complainant is tersely stated by his counsel in the brief as follows:

"The first proposition complainant makes is that this land dedicated to the people of the city of Port Huron as a public park has been subverted to a use foreign to that of a public park for which it was granted to the city.

"We maintain that, when property is dedicated for a public park, abutting property owners have a right to enjoin its use for any other purpose than a park, and that the erection of this building to be used as a transfer station for the patrons of the city electric railway is not using the property as a park.

"The city of Port Huron is merely the trustee of the park, which belongs to the public forever, and as such trustee it is the duty of the city of Port Huron by its officers and agents to cultivate, adorn, and decorate such park for park purposes only, and that to do anything else would be a violation of the trust. .

"We maintain that the building erected as the proofs show has nothing whatever to do with the park as a park; that it was not put there for the purpose of adorning and decorating the park or as an improvement to it, but was put there for the intent and purpose of a waiting room, not for people who wish to visit the park, but for those who, having taken the wrong car to go through to their destination, are obliged to wait on the corner for one going through to the point they wish to reach."

If the facts warranted the conclusion of counsel that the gift of Senator Palmer has been subverted to a use foreign to that of a public park, there is no doubt that complainant as an abutting property owner might seek the aid of a court of equity. See 21 Am. & Eng. Enc. Law, p. 1072; *City of Chicago* v. *Ward*, 169 Ill. 392 (48 N. E. 927, 38 L. R. A. 849, 61 Am. St. Rep. 185); *Church* v. *City of Portland*, 18 Ore. 73 (22 Pac. 528, 6 L. R. A. 259).

We think it helpful to quote some of the testimony. One of the witnesses for the complainant who did not approve of the building erected, nor of its location, and who testified it depreciated the vaue of complainant's property, testified, in part, as follows:

"The most desirable part of that park is on the north side in the grove for picnic purposes. The only point from which that grove can be reached is from the corner of Gratiot avenue and Garfield street, except to go around, and in order to reach that high part north of the depression, you have to cross the ravine or depression. I have been over the cinder path and the rustic bridge built by the North End Improvement Association. They offer as short and direct communication with the high ground there perhaps as anywhere.

"Palmer Park is a little over 2½ miles from the center of the city, and the citizens desiring to use it for recreation purposes would have to go by street car if they came from the south. That would be the most natural and convenient means of transfer at any time of year. Patrons going to that park by that line of transfer would find it convenient to disembark at the corner and to use the cinder path and rustic bridge to the higher ground on the north side of the park. It is a great convenience to people who visit that park in going to and from it in case of storm and inclement weather to have a building there for their protection or anybody who wants to take the car at that point."

Another witness for complainant testified on cross-examination, in part, as follows:

"*Q.* In your judgment the acquirement of that property as a public park is no benefit to that locality?

"*A.* Not at this time.

"*Q.* Would it be if improved as a park?

"*A.* Yes.

"*Q.* It would not be if left in its natural state?

"*A.* No.

"*Q.* What would you say as to a building for the accommodation of people coming to the park? Would that be a convenience to the public?

"*A.* It would be quite a convenience to the public.

"*Q.* How far is that park located from the center of the city?

"*A.* I should think it is probably two miles.

"*Q.* What would be the means of conveying the general public from the downtown district to the park?

"*A.* By street car.

"*Q.* Is it not a necessary convenience for the traveling public, people going to the park, to have located there a building for their accommodation?

"*A.* If they are going to the park, yes.  *  *  *

"*Q.* From your knowledge of parks and real estate, if the city were building a pavilion for the accommodation of patrons of that park, always taking into consideration that the city was cultivating that for park purposes, would that be a suitable location from that point?

"*A.* I think that would be the proper place for it; the cars transfer there, I would think it would.  *  *  *

"*Q.* Would it not be a convenience to the people using the park and coming to it by the street railway to have that building there to receive them?

"*A.* I think it would, yes.

"*Q.* That is true? .

"*A.* Yes, sir.

"*Q.* When the park is prepared for a skating rink on that low marshy place, it will be a great convenience to the people coming to that skating rink to have that building there to wait for the cars and to put their wraps there, would it not?

"*A.* It would be a benefit to the public in that way.

"*Q.* The public using the park?

"*A.* Yes.  *  *  *  There is a building in Pine Grove Park that has stood there 12 or 15 years. That pavilion has a sort of soft drink place underneath in the summer time. In connection with that building, there are also toilet rooms. From my experience in traveling about the country, I think it is a necessity to have such a building in these parks.

"*Q.* You think because of the fact that people transfer on that corner, and people going to that park would get off on that corner, and that being the most accessible point to the park for people coming on street cars, that is the proper place for such a building, if you are going to have one in the park?

"*A.* I take it, if the city is going to build a building, that would be the proper place."

One of the witnesses for defendants testified, in part:

"The preparation of the ground and the construction of the building has made Palmer Park more desirable for park purposes. It is an improvement to the corner there. It is a starter. We have a starter, and if they continue on they will soon make the park a great place for private picnics. In my estimation, it has made the park more desirable since these improvements have been made, for little picnics and park purposes other than it was before, and the building is used as park pavilion as much as it is for a waiting room."

Another witness testified, in part:

"*Q.* That park there has not been so developed as to make it a place for people to go and congregate for park purposes?

"*A.* I have seen a number of people there at once.

"*Q.* In what part of the 10 acres were they?

"*A.* In the low portion of the park.

"*Q.* You did not see any of them having occasion to use this building?

"*A.* They used the building because they were skating, a hundred or more at a time,.and I have seen them going from the pavilion down there and skating in the winter time.

"*Q.* They were using McNeil creek to skate on as you passed four times a day?

"*A.* Yes, sir."

A member of the improvement association testified, in part:

"I am a member of the North End Improvement Association, and am familiar with the purposes of that association. It is composed of citizens in the north end and some from other parts of the city. The purposes and objects are set forth in our articles of association.

"*Q.* What can you say to the court as to what the policy of the association is as to this pavilion and waiting room, and whether or not the work is to stop there, or whether it is the purpose of the association to carry the work further?

"*A.* The. work as projected was partially for the waiting room and partially for a pavilion for the park. It was partially outlined to make improvements on the park, as funds of the association could be gotten together by voluntary work of the members and sympathizers in this work.

"*Q.* Now, has the end of the project been reached by the construction of this building?

"*A.* By no means.

"*Q.* Tell the court what that purpose is?

"*A.* * * * First, the building has not been completed as outlined. Further, the matter was talked over of connecting the two parts of the park by a rustic bridge and cleaning up and making the park presentable, so it would be more like a park for park

purposes. Of course, it cannot be done all at once with voluntary subscriptions. The matter of rest rooms and toilet rooms has been talked over several times, and, as to toilet rooms, that matter was discussed at one of our last meetings, and generally agreed upon that, it being an open building, it would be impractical to put in toilets with the water flushed, but it was talked of putting in a dry closet, which can be made very sanitary and put in very cheaply. It is the intention to continue this work of which the building of this pavilion is but the beginning and the installation of toilet rooms and rest rooms for the accommodation of the people who are obliged to assemble there at this point, and for whose benefit this waiting room was constructed."

There was testimony as follows:

"The object of the association is to improve the conditions in the north end of the city wherever we have an opportunity. I think it was at least partly due to our influence that Elmwood street bridge was placed back in place, and the road fixed in condition and the bridge over. We built the pavilion in Palmer Park, cleared the ground, built a rustic bridge, and cinder path. The purpose of having that building on the corner of the park was as a pavilion for the park and the other as a waiting room."

On examination by Mr. Wellman, witness stated:

"I have visited parks in other cities. In any parks that I have ever seen, there has been a waiting room of some sort to accommodate the people, for people coming and going. That is a recognized park purpose. * * * The majority of the land in that park is low. There is not much difference between the quantities of high land on the south side and that on the north side of the ravine. In connection with the use of the pavilion during the winter months, we have made arrangements to block McNeil creek up and flood that low ground and make a skating rink for the people, and to take the question up of opening up that pavilion and put in a heating system so that people may go in there and hang up their clothing and put on their skates, etc. That is part of the program

planned by the association for this winter. I think Mr. Draper has the written resolution to that effect. "The resolution was received in evidence."

In Words and Phrases there are several definitions of the words "park" and "public park." One of them reads:

"A park is variously defined to be a pleasure ground in or near a city, set apart for the recreation of the public; a piece of ground inclosed for the purposes of pleasure, exercise, amusement or ornament; a place for the resort of the public for recreation, air and light; a place open for every one. *State, ex rel. Attorney General,* v. *Schweickardt,* 109 Mo. 496, 19 S. W. 47, 51 (citing *Perrin* v. *New York Cent. R. Co.,* 36 N. Y. 120; *Price* v. *Inhabitants of City of Plainfield,* 40 N. J. Law [11 Vroom] 613)."

Another definition is:

"In its common and ordinary significance, a public park is an open or inclosed tract of land and adapted for, set apart, maintained at public expense, and devoted to the purposes of pleasure, recreation, ornament, light and air for the inhabitants of the town near or in which it is located." 3 McQuillin, Mun. Corp., pp. 2533, 2534, and cases cited in footnote.

In 28 Cyc. p. 936, it is said:

"Property constituting parks, public squares and commons may, in the absence of express restriction, be used in such manner as will promote the public interest and is not inconsistent with the purpose for which it was intended."

Again:

"A park may be devoted to any use which tends to promote popular enjoyment and recreation, although primarily involving the ideas of open air and space, occupation in part by monuments, statues, museums, galleries of art, free public libraries and other agencies contributing to the aesthetic enjoyment of the people, is not a perversion of the lands from park purposes. These are maintained for the use, convenience and

recreation of persons resorting to and using public parks." 3 Dillon, Mun. Corp. pp. 1749, 1750.

"Some of the powers of control and regulations for their use held to be reasonable and valid are: * * * Power to lay out pleasure drives around the borders of a public square, authority to erect a building in a park for public purposes, and if a building called a casino so erected is adapted to a public use, the court will not assume that is to be used for private purposes; to erect a dwelling house on park property to be used by the park superintendent and his family as a residence and also for an office by such superintendent and his associates." 3 McQuillin, on Corp. p. 2541.

We think it clear that the use made of the building is a public use, and that such use is not foreign to that of a public park.

The decree is affirmed, with costs.

BROOKE, C. J., and PERSON, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.