No. 28,189.

THE CITY OF WICHITA, *Appellant*, v. L. W. CLAPP et al., as The Board of Park Commissioners of the City of Wichita, *Appellees*.

(263 Pac. 12.)

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS—*Parks—Devotion of Portion to Use as Airport.* The devotion of a reasonable portion of a public park to an airport (aviation field), for recreation and other attendant purposes comes within the proper and legitimate uses for which public parks are created.

2. SAME—*Parks—Statutory Authority to Acquire and Use as Airports.* Chapter 117 of the Laws of 1927 authorizes the board of park commissioners of cities of the first class having a population between 80,000 and 110,000 to acquire public parks within five miles of the corporate limits of such cities, a reasonable portion of which may be used for airports.

3. SAME—*Parks—Statutory Authority to Acquire and Use as Airports.* The provisions of R. S. 3-110 are sufficiently comprehensive to enable the governing body of cities to maintain airports or aviation fields which are located in public parks owned or controlled by such cities within five miles of the corporate limits thereof.

Appeal from Sedgwick district court, division No. 1; J. EVERETT ALEXANDER, judge. Opinion filed January 7, 1928. Modified.

*A. V. Roberts, Vincent F. Hiebsch* and *Roger P. Almond,* all of Wichita, for the appellant.

*R. R. Vermilion, Earle W. Evans, Joseph G. Carey* and *W. F. Lilleston,* all of Wichita, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The question presented here is whether a city of the first class with a population of around one hundred thousand may acquire and maintain an airport as part of a municipal park. Wichita is a city of the class described. The defendants constitute its board of park commissioners. On November 14, 1927, the park commissioners passed a resolution, which among other things stated:

"That it be and is hereby deemed and declared desirable and a public necessity to acquire title and possession for public park, public recreation, aviation and airport purposes for the use and benefit of the people of the city of Wichita (the following-described) lands located and situated in Sedgwick

Municipal Corporations, 43 C. J. pp. 1327 n. 76, 1328 n. 80; 28 Cyc. pp. 935 n. 19, 936 n. 25.

county, Kansas, outside of the corporate limits of the city of Wichita, and within less than five miles therefrom."

The petition alleged that the—

"Property thus sought and intended to be acquired by said park board is now and for a long time has been equipped and used for and as an airport which the inhabitants of said city do and will continue to visit in large numbers, particularly on Sundays and on various occasions of popular interest; that pleasure planes devoted to recreation, business planes devoted to commercial purposes and government planes carrying the United States mails, come and go daily to and from said airport and from and to other airports in distant cities and localities; that pleasure planes without charge and commercial planes for a fee carry passengers daily, make flights from the airport and return thereto for the recreation of the occupants. . . ."

The petition also alleged that thirty per cent of the ground would be used for other park purposes and seventy per cent for an aviation field; that there prevailed an actual controversy between the plaintiff and the park commissioners as to whether the acquisition of the property sought by the park board for the purposes set out was permissible and legal, under the provisions of a recently enacted statute which in part reads:

"The board of park commissioners of any city of the first class having a population of more than 80,000 and less than 110,000 shall have the power to acquire by purchase, gift, condemnation or otherwise, such lands as they may deem necessary for public parks outside of the corporate limits of the city and not to exceed five miles therefrom and to issue and sell, subject to the limitations of this act, general bonds of the city to pay therefor." (Laws of 1927, ch. 117.)

The specific question for consideration is whether park purposes may include an airport or landing field for airplanes. · Under various authorities, the expression "park purposes" has been held to include a race track, a tourist camp, bridle trails, boating, bathing, refreshment and lunch stands, providing bathing suits, towels and rooms for bathers, dressing pavilion, waiting room for street cars, refreshment and shelter room for the public, grandstand, ball games, baseball diamond, race meets, tennis courts, croquet grounds, children's playgrounds, hotels, restaurants, museums, art galleries, zoölogical and botanical gardens, conservatories, and many other recreational and educational facilities. In *Bailey v. City of Topeka,* 97 Kan. 327, 330, 154 Pac. 1014, this court quoted approvingly from Dillon on Municipal Corporations, to the effect that:

"A park may be devoted to any use which tends to promote popular enjoyment and recreation." (Dillon, Municipal Corporations, 5th ed. § 1096, p. 1749.)

*State, ex rel., v. Dodge City,* 123 Kan. 316, 317, 318, 255 Pac. 387, involved the question whether a city park dedicated for general park purposes might be used for the operation of a tourist camp. This court said:

"It is contended that the operation and maintenance of the tourist camp is a commercial enterprise in which the city has no power to engage, and that the maintenance of the camp in the city park, is a diversion and misuse of the park—therefore, unauthorized and illegal. . . . Dodge City is a city of the second class. In the year 1900 certain tracts of land were deeded to it for general park purposes. The money necessary for the purchase of such land was raised by popular subscription except $500 which was contributed from the city treasury. Some money raised by popular subscription remaining, after the purchase had been made, was used in clearing the land, laying out a race track, etc. In 1917 an automobile camp was laid out in the park and in 1923, various conveniences for the benefit of the traveling public having been constructed, a charge was made for the use of the automobile grounds. In the summer of 1925 the city constructed fifteen one-room cottages for the convenience of the tourists, costing approximately $1,835. Another cottage (cook house) costing about $650 was constructed at the same time. . . . The city made a charge of thirty-five cents per day for camping privileges and a charge of one dollar per day for the use of a cottage. A small grocery store is operated in the park under the management of the park custodian, who is also a commissioned police officer. . . . All moneys received from the tourist camp are turned over to the park commissioner to be placed in the park funds for the maintenance of the camp; whatever is left, if any, being used for general upkeep of the camp. There was evidence that two private tourist camps, located just outside the city limits, could amply care for the tourist traffic. . . . This practice has grown until nearly every city of consequence has established a tourist camp, and in most cases as a part of the city park. It was natural that the cities should do this. . . . The original concept of a city park has by usage during the last twenty years broadened to include the maintenance of a tourist camp. . . . The tourist camp is part and parcel of the modern municipal park. Its maintenance as a part of the modern municipal park is not different in principle from maintenance of a swimming pool therein, about which there is no longer contention."

The supreme court of Michigan considered a somewhat similar question, and held substantially that where a pavilion was erected on a public park to serve the double purpose of a waiting room for street cars and refreshment and shelter room for the public using the park, the building being located at a proper and convenient place for both purposes, such building and use were not foreign to "public park" purposes. (*Dodge v. North End Association,* 189 Mich. 16, 155 N. W. 438.)

"The park board, having control over the city parks, may grant a privilege for a public stage route, stations and waiting rooms in a park, where the right to run stages is confined to their operation for the sole purpose of carrying visitors into or out of the park or from one portion thereof to another." (*American Steel House Co. v. Willcox*, 38 Misc. 571, 77 N. Y. S. 1010.)

"A city has power to grant a license or concession to hold, in said park, race meets, for short periods of time, for the entertainment of the public." (*Nebraska City v. Nebraska City Speed & Fair Ass'n*, 107 Neb. 576, 583, 186 N. W. 374.)

On the question of the power of the city to supply its citizens with libraries, museums and places for public recreation, see *Commonwealth v. Horrigan*, 84 Mass. 159; *Laird v. Pittsburg*, 205 Pa. St. 1, 54 Atl. 324; *Lambert, Mayor, v. Bd. Trustees Public Library, etc.*, 151 Ky. 725, 152 S. W. 802. For establishment of municipal golf links, see *Capen v. City of Portland*, 112 Ore. 14, 228 Pac. 105.

"The devotion of a reasonable portion of a public park to tennis courts, croquet grounds, and children's playgrounds, with suitable appliances for these forms of public amusement and recreation, comes strictly within the proper and legitimate uses for which public parks are created." (*Caulfield v. Berwick*, 27 Cal. App. 493, syl. ¶ 2, 150 Pac. 646.)

In *Spires v. City of Los Angeles*, 150 Cal. 64, 87 Pac. 1026, it was said:

"As matter of public knowledge, we are aware that the erection of hotels, restaurants, museums, art galleries, zoölogical and botanical gardens, conservatories, and the like in public parks is common, and we are not pointed to any authority where it has been regarded as a diversion of the legitimate uses of the park to establish them, but on the contrary, their establishment has been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit. To instance, in Central Park in New York City, there is a museum of natural history and a metropolitan art museum; and in Golden Gate Park in San Francisco a museum, children's playground, and buildings used in connection with it, and a conservatory. We mention simply these parks and particular features devoted to the public enjoyment, although many other parks might be mentioned where similar buildings have been erected."

The last few years have witnessed a remarkable development of aviation in all lines. In a pamphlet on airport construction, issued by the aëronautics branch of the United States Department of Commerce, it is said:

"The commercial value of an airport is not its only consideration. It has an important value as a recreation facility similar to city parks, golf courses, equestrian trails, bathing beaches, etc., and it should be a municipal enterprise.

The air commerce act of 1926 recognizes this by providing that civil airports shall not be owned or operated by the federal government."

A recent article by Commander Richard E. Byrd, an authority on aviation, states that the year 1927 brought the greatest forward strides in the history of aviation and that the new year (1928) gives promise of far outstripping that record. He directs attention to the brilliant flying successes of Col. Charles A. Lindbergh and Clarence B. Chamberlain, but emphasizes the need of landing fields or airports. He says:

"The exploitation of flying developed a sturdy air consciousness on the part of the public that caused aviation to find its place in world commerce. The result was that 1,000 new flying fields have been built, regular air lines have been established, the carrying of air mail has been turned over to private companies which are also carrying express. Passenger routes have been started. . . .

"This year's accomplishments showed that we had some very good ships. We have speed and economic operation. What we need now is safety, and aviation can be made safe to-day. There are several things to be done. Among them are the building of more landing fields, . . . the perfection of a fog-piercing beacon with which to light fields, the use of the radio beacon for aiding aerial navigation, the carrying of surplus fuel to fly thru or around fog. The one outstanding need now is sufficient landing facilities for planes. I consider it the duty of every city to establish a field. By so doing they will not only help themselves, but they will help aviation. Cities that hold back in the matter of providing landing fields are holding back aviation nationally."

Aëronautical development emphasizes the vital importance of "airways," an essential element of which is the landing field or airport. The term "airway" applies to air routes for either airplanes or seaplanes. An airway is far more than a mere air line. It is a material and permanent way through the air, laid out with the precision and care that an engineer adopts in choosing the course of and laying down of a railway. Whether over land or water, it is essentially on the ground. Its existence and general layout depend almost entirely upon the commercial demand. The primary requisite of any airway is that it shall be safe, reliable and regular. These attributes can be gained only if it is adequately laid out and equipped, and first and foremost of these attributes are airports or landing fields. The demand for more and more airports throughout the country is urgent and will continue to increase. A typical example of a modern airway is the transcontinental route between New York and San Francisco, said to be the most completely equipped air-

way in the world.   On it between New York and Salt Lake City are 12 airports and 92 intermediate fields, connected by 612 electric and gas route beacons spaced along and indicating the entire distance.   The electric beacons of 1,000,000 and 2,000,000 candlepower are, in general, located at or near intermediate fields and are spaced approximately 22 miles apart with the smaller gas beacons between.

The airway is essentially a free highway.   As such it is open to all qualified aircraft.   It is rightly, therefore, a federal undertaking to lay out and equip airways.   The maintenance of airports, however, comes legitimately within the scope of the municipality in much the same manner as docks and harbor facilities for marine shipping. Airports are said to be as important to commerce as are terminals to railroads or harbors to navigation.   Municipalities are studying local conditions and commercial organizations are pressing the importance of establishing terminal airports and of providing proper lighting for landing fields, and facilities such as hangars, garages and repair shops.   The possession of the airport by the modern city is essential if it desires opportunities for increased prosperity to be secured through air commerce.   Lands susceptible of improvement, as parks, playgrounds, or general recreational purposes, may be utilized and developed around the modern airport so that the municipality may bring to itself not only the advantages of air commerce but afford its citizens those other inestimable advantages of improved beautification and health-giving opportunities.   It is said that there were 3,800 landing fields in the United States at the close of 1926, of which 400 were municipal.   (See 1927 Aircraft Year Book, p. 101, et seq.)   In a dozen cities of the far west (California, Oregon, etc.) projects for new airports or improvements of existing facilities are under way at an estimated cost of more than $8,000,000.   (The American City, July, 1927.)   In these rapidly changing times, even a wise man cannot discern the needs of the future.   All signs indicate that in another twenty-five years airports may be needed for tourists as much as tourist camps are at this time needed for those on recreation and pleasure bent.   Perhaps it may not be a "great way" into what ordinarily would be termed the "far distant future" when the human race will be flying with wings similar to those described by Bulwer Lytton in "The Coming Race."   In any event we are of opinion that the airport or landing field is as properly included within park purposes as tourist camps and other named

recreational objects, and that the board of park commissioners of Wichita is authorized and empowered, under the provisions of chapter 117 of the Laws of 1927, to proceed to purchase or condemn the lands in question for the purposes stated.

Wichita is in the center of what is perhaps the largest natural landing field in America. It has a climate permitting year-around flying with no fogs, and rare periods of unfavorable weather. At the present time seven airplane factories are located there, six of which are now producing airplanes and the seventh will be producing by February 1, 1928. Upwards of one thousand airplanes of all types have been constructed there. In addition to the airport under consideration, Wichita has four commercial airports or landing fields.

Various state legislatures, including our own, have recognized the airport as a proper municipal enterprise. A section of our aircraft act reads:

"That whenever in the opinion of the governing body in any city in the state of Kansas, the public safety, service and welfare can be advanced thereby, such governing body of such city may acquire by purchase or lease and maintain a municipal field for aviation purposes, and pay the expense of such purchase, lease or maintenance out of the general funds of the city. Such field may be used for the service of all aircraft and pilots desiring to use same." (R. S. 3-110.)

By an act of the general assembly of Georgia, 1927, Atlanta charter amendments, No. 360, sec. 4, et seq. (Georgia Laws, 1927), the city of Atlanta was authorized and empowered to purchase, own and operate municipal landing fields either within or without the limits of the city, within a radius of twenty-five miles from the center of the city, and given police power over such airports, except where they might be located within the limits of some other municipality.

By an act of 1922, chapter 534 (as amended by section 57, chapter 90, of the Laws of 1927), the legislature of Massachusetts empowered cities or towns to designate landing places and to make reasonable rules and regulations concerning the use thereof.

The legislature of Montana, by an act passed in 1927, empowered cities and towns to acquire by gift, purchase or condemnation, lands for landing fields, within or without their corporate limits and to exercise jurisdiction over such lands. (Laws of 1927, ch. 20.)

The general statutes of Ohio (§ 3677, ¶ 15) authorized municipal

City of Wichita v. Clapp.

corporations to establish landing fields either within or without their corporate limits.

By act 328 of the Laws of Pennsylvania, 1925, that state authorized and empowered cities of the first class to acquire by lease, purchase or condemnation lands within or without their corporate limits for the purpose of establishing and maintaining municipal airdomes or aviation landing fields.

The general rule is that a municipal corporation has no power to purchase and hold land for a park or other municipal purpose beyond its corporate limits unless the power has been specially conferred by the legislature. (See *Township of Summit v. City of Jackson,* 154 Mich. 37, 117 N. W. 545, 18 L. R. A., n. s., 260; *Ionable v. Harrisonburg,* 104 Va. 533, 52 S. E. 174, 2 L. R. A., n. s., 910; *Childs v. City of Columbia,* 87 S. C. 566, 70 S. E. 296, 34 L. R. A., n. s., 542; *Becker v. The City of La Crosse,* 99 Wis. 414, 40 L. R. A. 829; *State, ex rel., v. Franklin,* 40 Kan. 410, 19 Pac. 810; 1 Lewis, Eminent Domain, 3d ed. § 371; 43 C. J. 1327.)

We are of opinion that while the provisions of R. S. 3-110 before quoted are not sufficient to authorize the purchase or condemnation of the land in question (it being beyond the corporate limits of the city), they are sufficient to enable the governing body of the city to maintain such an airport out of general funds, the park, including the airport having been secured under the provisions of chapter 117 of the Laws of 1927.

However, another section of the statute authorizes the purchase or lease of land within or without the limits of cities to be used as public parks, etc., provided the governing body is instructed to do so by a majority of votes cast at an election held for such purpose. (R. S. 12-1301.)

The judgment of the district court is modified in accordance with the views herein expressed, and as so modified is affirmed.