# STATE OF MICHIGAN

# COURT OF APPEALS

DON'T DRILL THE HILLS, INC.,

      Plaintiff-Appellant,

v

CITY OF ROCHESTER HILLS, JORDAN
DEVELOPMENT COMPANY, L.L.C., and
SUNOCO PIPELINE, L.P.,

      Defendants-Appellees.

UNPUBLISHED
March 24, 2016

No. 324717
Oakland Circuit Court
LC No. 2014-140827-CH

Before: TALBOT, C.J., and WILDER and BECKERING, JJ.

PER CURIAM.

Plaintiff, Don't Drill the Hills, Inc., filed this action for declaratory relief regarding the validity of a lease that defendant, the city of Rochester Hills (the city), entered into with defendant, Jordan Development Company, L.L.C. (Jordan Development), and an easement the city gave to defendant, Sunoco Pipeline, L.P. (Sunoco Pipeline). The circuit court granted defendants summary disposition pursuant to MCR 2.116(C)(5) and (8), and denied plaintiff's motion for summary disposition under MCR 2.116(I)(1) and (2). Plaintiff appeals as of right. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff is a non-profit corporation organized "for purposes which include taking actions to oppose oil and gas drilling and leasing in and/or by the City of Rochester Hills . . . ." Plaintiff's complaint raised allegations about agreements pertaining to subsurface oil and gas rights beneath city-owned parks and/or cemeteries: the "Jordan Development Lease," the "Sunoco Pipeline Right of Entry," and the "Sunoco Pipeline Easement." As to the Jordan Development Lease, in January 2013, the city leased to Jordan Development for five years the right to obtain oil and gas from beneath approximately 61 acres of city-owned property in Nowicki Park, Tienken Road Park, and Van Hoosen Jones Stoney Creek Cemetery. The lease authorized Jordan Development to undertake

> exploring by geophysical and other methods, drilling, mining, operating for and
> producing oil and/or gas, together with all rights privileges and easements useful
> or convenient in connection with the foregoing and in connection with treating,

-1-

storing, caring for, transporting and removing oil and/or gas of whatsoever nature or kind, including coal seam methane gas . . . .

Exhibit A of the lease contained additional terms, including a paragraph precluding Jordan Development from utilizing on the city-owned property "the procedure known as High Volume Hydraulic Fracturing." The lease further precluded Jordan Development from the following:

Lessee shall have no right of entry and shall conduct no operations on the surface of the leased premises without further official approval of the City Council and compliance, as necessary, with applicable ordinance or charter requirements. Stated another way, Lessee shall not erect, construct, store or maintain any wells, drill rig, storage tanks, pumps, pipes, or other in-ground or above-ground structures, facilities or equipment on the leased premises; Lessee, through its operations, shall not disrupt, interfere with, restrict, drain, damage, destroy or remove any natural or man-made condition, feature or improvement located on the leased premises; nor shall Lessee's operations hinder, interfere with, restrict or otherwise adversely affect the current or future use and development of the leased premises for parks, open space and public recreation without further official approval of the City Council and compliance, as necessary, with applicable ordinance or charter requirements[.]

In short, Jordan Development entered into a lease agreement for subsurface oil and gas rights underneath the parks and cemetery. Jordan Development cannot enter, operate, or erect structures on the surface of any parks without: (1) approval from the City Council; and (2) compliance "with applicable ordinance or charter requirements." Jordan Development is also prohibited from affecting the use of parks without obtaining approval and complying with applicable ordinance and charter requirements.

As to Sunoco Pipeline, in September 2013, the city and Sunoco Pipeline entered a "right of entry agreement" (Sunoco Pipeline Right of Entry) regarding Bloomer Park, a city-owned property. The agreement authorized Sunoco Pipeline to replace a pipeline that had existed since a November 9, 1950 agreement entered by the predecessors in interest of the city and Sunoco Pipeline.[1] The September 2013 agreement allowed Sunoco Pipeline to conduct the following activities:

To, at [Sunoco Pipeline's] sole cost and expense, *utilizing horizontal directional drilling,* construct certain pipeline facilities, including, but not limited

---

[1] According to the city, at the time of the 1950 agreement, Bloomer Park was a state park. The Department of Conservation for the State of Michigan granted Sunoco Pipeline's predecessor, Susquehanna Pipe Line Company, a permit giving it the "right to lay a pipe line and maintain, operate, repair, replace and remove the same over and through" the subject property, and a pipeline was built in compliance with that permit. In 1993, the state conveyed the park to the city.

to, erecting, laying, constructing, maintaining, operating, repairing, inspecting, replacing, changing the size of, protecting, altering, abandoning and removing said facilities, including, but not limited to, fittings, meters, pipes, pipelines, conduits, tie-ins, electrical facilities and electric lines, and any and all other devices, equipment to facilitate the operation, maintenance, repair and use of its pipeline . . . , below the surface of the ground along, under, through and across said Premises. [Emphasis added.]

The agreement specified that the replacement pipeline would consist "of equal width as the [pipeline] now in place." Sunoco Pipeline agreed that it would not "interfere with the normal operation of the Premises or impair access to the Premises." Sunoco Pipeline also agreed to utilize a horizontal boring method to install the new pipeline; this method would eliminate the need to use construction equipment to dig a trench from the surface.

On April 8, 2014, the city and Sunoco Pipeline entered a "pipeline right-of-way easement," (Sunoco Pipeline Easement) which granted Sunoco Pipeline a permanent, non-exclusive 25-foot-wide right-of-way and easement in an agreed upon location "to construct, install, maintain, operate, repair, inspect, alter, protect, change the size of, relocate, replace in whole or in part, remove and abandon a pipeline or pipelines and other appurtenant facilities." This agreement recognized the need to change the location of the 1950 pipeline. The change in location of the new pipeline from that of the 1950 pipeline was required because the horizontal-boring method that was to be used in installing the new pipeline could not make the same sharp turn that the original pipeline took. Sunoco Pipeline agreed to "engage in Best Tree Management and Preservation Methods recognizing the park nature of the Right-of-Way when engaged in trimming and removal" of trees or plants in the easement.

According to plaintiff's complaint, the Jordan Development Lease unlawfully authorized Jordan Development to seek, produce, and remove gas and oil located beneath city parks and a city-owned cemetery. Plaintiff alleged that the Jordan Development Lease violated the rights of its members to vote on public park transfers under MCL 117.5(1)(e) and Rochester Hills City Charter § 11.8. Regarding Sunoco Pipeline, the complaint challenged the validity of the Sunoco Pipeline Right of Entry and Sunoco Pipeline Easement agreements. Plaintiff alleged that these agreements violated the rights of its members because it amounted to a prohibited sale under MCL 117.5(1)(e) as well as a conversion of a park to a use not directly related to public recreation or conservation in contravention of Charter § 11.8.

Plaintiff's alleged right to vote emanated from two sources, Charter § 11.8 and MCL 117.5(1)(e). Charter § 11.8 provides:

> City-owned parks and open spaces shall be used only for park and open space purposes and shall not be sold, leased, transferred, exchanged or converted to another use unless approved by a majority of votes cast by the electors at an election.
>
> 1. "Converted to another use" means changing the use of a park or open space, or a significant part thereof, from a recreation or conservation use to another use not directly related or incidental to public recreation or conservation.

2. This section shall apply to all present and future City-owned property designated as park or open space in the City's Parks and Recreation Master Plan. The designation of parks or open space shall not be removed or changed without voter approval. The existing use of a park or open space on the effective date of this section shall be considered to be a lawful use for the particular property.

MCL 117.5(1)(e) of the Home Rule City Act provides that a city does not have authority "to sell a park, cemetery, or any part of a park or cemetery, except where the park is not required under an official master plan of the city . . . unless approved by a majority of the electors voting on the question at a general or special election."

The circuit court granted summary disposition to defendants under MCR 2.116(C)(5) and (C)(8), finding that there was no right to vote on either the Jordan Development Lease or the Sunoco Pipeline agreements, per the plain language of MCL 117.5(1)(e) or Charter § 11.8. The court also found that plaintiff lacked standing to challenge the agreements.

## II. ANALYSIS

Because plaintiff's members claimed the right to vote on the Jordan Development Lease and the Sunoco Pipeline agreements pursuant to MCL 117.5(1)(e) and Rochester Hills City Charter, § 11.8, we address the circuit court's interpretations of the Jordan Development Lease, the Sunoco Pipeline agreements, MCL 117.5(1)(e), and Charter § 11.8.

## A. STANDARDS OF REVIEW

We review de novo a circuit court's summary disposition ruling. *Cottonwood v Banks*, 310 Mich App 104, 111; 872 NW2d 1 (2015). Although the circuit court invoked subrule (C)(8) in granting summary disposition, the court also could have granted summary disposition pursuant to MCR 2.116(C)(10).[2] A motion brought under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of

---

[2] In granting summary disposition, the circuit court may have considered documentary evidence that the parties submitted after their pleadings. However, "even if a trial court errs in granting summary disposition under the wrong subrule, this Court may review the issue under the correct subrule," and "this Court will not reverse a trial court's decision if" it reaches a correct for a wrong reason. *Computer Network, Inc v AM Gen Corp*, 265 Mich App 309, 313; 696 NW2d 49 (2005).

reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183.

We consider de novo the legal question inherent in statutory construction. *CG Automation & Fixture, Inc v Autoform, Inc*, 291 Mich App 333, 337; 804 NW2d 781 (2011). The following guidelines apply to a court's statutory construction efforts:

> The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature in enacting a provision. Statutory language should be construed reasonably, keeping in mind the purpose of the statute. The first criterion in determining intent is the specific language of the statute. If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written. However, if reasonable minds can differ regarding the meaning of a statute, judicial construction is appropriate. [*Id.* at 338 (quotation marks and citations omitted).]

The rules governing statutory interpretation also govern the construction of city charters. *Detroit v Walker*, 445 Mich 682, 691; 520 NW2d 135 (1994).

Principles governing contract interpretation apply when a court reviews the language comprising a lease or an easement. *In re Egbert R Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008); *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003). "Questions involving the proper interpretation of a contract or the legal effect of a contractual clause are . . . reviewed de novo." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

> In interpreting a contract, it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law. However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties. [*In re Egbert R Smith Trust*, 480 Mich at 24 (citations omitted).]

### B. GOVERNING STATUTE AND CHARTER LANGUAGE

Plaintiff complains that absent voter approval by the residents of the city, the plain language in Charter § 11.8 broadly prevents any transfer of a city-owned park for private purposes, as allegedly occurred in both the Jordan Development Lease and the Sunoco Pipeline agreements. Similarly, absent voter approval, MCL 117.5(1)(e) plainly prohibits any transfer of a city-owned park or cemetery for private purposes, which plaintiff alleges occurred in the Jordan Development Lease and the Sunoco Pipeline agreements.

Pursuant to MCL 117.5(1)(e):

> A city does not have power to do any of the following:

* * *

. . . to sell a park, cemetery, or any part of a park or cemetery, except where the park is not required under an official master plan of the city . . . .

Charter § 11.8 provides, in relevant part:

City-owned parks and open spaces shall be used only for park and open space purposes and shall not be sold, leased, transferred, exchanged or converted to another use unless approved by a majority of votes cast by the electors at an election.

(1) *"Converted to another use" means changing the use of a park or open space, or significant part thereof, from a recreation or conservation use to another use not directly related or incidental to public recreation or conservation.*

(2) This section shall apply to all present and future City-owned property designated as park or open space in the City's Parks and Recreation Master Plan. The designation of parks or open space shall not be removed or changed without voter approval. *The existing use of a park or open space on the effective date of this section shall be considered to be a lawful use for the particular property. . . .* [Emphasis added.]

## C. APPLICATION OF MCL 117.5(1)(e)

The circuit court correctly interpreted the disputed language in MCL 117.5(1)(e) as being inapplicable to the Jordan Development Lease or the Sunoco Pipeline agreements. MCL 117.5(1)(e) declares that, absent a special election, a city lacks authority "to sell" a park, cemetery, or any part of a park or cemetery. Plaintiff offers a construction of the word "sell" that would apply to ban leases (in the case of Jordan Development), and easements (in the case of Sunoco Pipeline). We hold that such a construction is not consistent with the plain language of the statute.

The key to our analysis lies in the meaning of the word "sell" or "sale." A reviewing court "may consult dictionary definitions to give words their common and ordinary meaning." *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011). The word "sell" possesses legal connotations, for which we find it helpful to consult a legal dictionary. See *Johnson v Pastoriza*, 491 Mich 417, 436; 818 NW2d 279 (2012). *Black's Law Dictionary* (10th ed, 2014) defines "sell" as "[t]o transfer (property) by sale." "Sale" means "[t]he transfer of property or title for a price," "[t]he agreement by which such a transfer takes place," or "a transfer of the absolute title to property for a certain agreed price." *Id*. at 1537 (quotation marks and citation omitted).[3] *Black's Law Dictionary* defines "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury

---

[3] Caselaw has adopted this idea of a sale, i.e., that it constitutes the transfer of title for a price. See, e.g., *State v McQueen*, 293 Mich App 644, 668; 811 NW2d 513 (2011), citing MCL 440.2106(1) (defining a "sale" under the Uniform Commercial Code).

to the land," and "can be either corporeal (soil or buildings) or incorporeal (easements)." *Id*. at 1412.

This case involves a lease of interests in real property and an easement to use real property. A "lease" means "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu. rent," which "can be for life, for a fixed period, or for a period terminable at will." *Id*. at 1024. An "oil-and-gas-lease" signifies a "lease granting the right to extract oil and gas from a specified piece of land." *Id*. at 1026. An "easement" constitutes "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose." Id. at 622. These definitions carry with them the idea that something *less* than title is at stake in leases and easements. This is consistent with the understanding of leases and easements in our caselaw. See *Mobil Oil Corp v Dep't of Treasury*, 422 Mich 473, 479-480; 373 NW2d 730 (1985) (explaining that a lease involves a finite right, rather than the passing of title for a price); *Schumacher v Dep't of Natural Resources*, 275 Mich App 121, 130; 737 NW2d 782 (2007) (explaining that an easement involves the limited right to use, and is distinct from an ownership interest).

We hold that the MCL 117.5(1)(e), which prohibits the *sale* of a park, cemetery, or any part of a park or cemetery, is not implicated by the transactions that occurred in this case. As noted above, the word "sale" carries with it the idea that title is transferred for a price. Quite simply, the transfer of title for a price did not occur here. Neither the lease with Jordan Development nor the agreements with Sunoco Pipeline involved the transfer of title to a park or cemetery. Instead, as is apparent from both the lease and easement documents at issue, the city conveyed a right of use for a specific purpose, i.e., extracting or conveying oil and gas. These agreements are consistent with leases and easements as they are traditionally understood, and bear none of the markings of a sale as it concerns parklands or cemeteries. See *Mobil Oil Corp*, 422 Mich at 479-480; *Schumacher*, 275 Mich App at 130. Plaintiff's argument would have us ignore the differences between sales, leases, and easements and read into the statute concepts which are plainly not present. We decline to do so. See *Johnson v Recca*, 492 Mich 169, 176 n 4; 821 NW2d 520 (2012) (explaining that "the expression of one thing [in a statute] suggests the exclusion of all others") (quotation marks and citation omitted).

To the extent plaintiff argues that any gas or oil extracted under the agreements at issue is sold, we decline plaintiff's invitation to find that this is a "sale" in violation of the statute. The statute prohibits the sale of "a park, cemetery, or any part of a park or cemetery." MCL 117.5(1)(e). Not defined in the statute, the word "park"—discussed in more detail below—is defined to mean "a tract of land that often includes lawns, woodland, and pasture attached to a country house and is used as a game preserve and for recreation"; or "a piece of ground in or near a city or town kept for ornament and recreation." *Merriam-Webster's Collegiate Dictionary* (11th ed, 2014). A cemetery meanwhile is defined as "a burial ground." *Id*. As is apparent from these definitions, the common understandings of these terms do not contemplate subsurface oil and gas, such that subsurface oil and gas would be considered part of "parks" or "cemeteries." Nor has plaintiff presented any compelling argument as to why subsurface oil and gas should be considered part of a "park" or "cemetery" as those terms are commonly understood. Accordingly, neither the Jordan Development Lease nor the Sunoco Pipeline agreements

constituted the sale of a cemetery or a public park, "or any part of park or cemetery." MCL 117.5(1)(e).

## D. APPLICATION OF CHARTER § 11.8

Charter § 11.8 plainly prohibits the use of city-owned parks and open spaces for other purposes, absent a city resident vote to convert the park or open space to another use. Our analysis on this issue is shaped by the definitions and common understanding of the word "park." Again, a "park" is, in relevant part, "a tract of land that often includes lawns, woodland, and pasture attached to a country house and is used as a game preserve and for recreation"; or "a piece of ground in or near a city or town kept for ornament and recreation." *Merriam-Webster's Collegiate Dictionary* (11th ed, 2014). In *Dodge v North End Improvement Ass'n*, 189 Mich 16, 27; 155 NW 438 (1915), our Supreme Court similarly defined the term "public park" as follows:

> A park is variously defined to be a pleasure ground in or near a city, set apart for the recreation of the public; a piece of ground inclosed for the purposes of pleasure, exercise, amusement or ornament; a place for the resort of the public for recreation, air and light; a place open for every one. [Quotation marks and citation omitted.]

As aptly recognized by the trial court in this case, "[i]nherent in these definitions is that a park consists only of reasonably visible portions of the land. In other words, only the surface of the land may constitute a park."

In light of the definition of a public park in *Dodge*, 189 Mich at 27, and the similar dictionary definition of public park, the Jordan Development gas-and-oil-lease clearly and unambiguously will not alter the nature of the city's public parks or convert the parks to another use. The Jordan Development Lease precluded it from pursuing hydraulic fracturing, having any right of entry on the property, conducting any "operations on the surface of the leased premises," erecting, constructing, storing, or maintaining "any wells, drill rig, storage tanks, pumps, pipes, or other in-ground or above-ground structures, facilities or equipment on" the property, disrupting, interfering with, restricting, draining, damaging, destroying, or removing "any natural or man-made condition, feature or improvement located on the" property, or doing anything to "hinder, interfere with, restrict or otherwise adversely affect the current or future use and development of the leased premises for parks, open space and public recreation." We detect no risk to the nature of the public park posed by the Jordan Development lease, and no conversion of a public park to another use, Charter § 11.8(1). A park is commonly understood in terms of the surface, and the Jordan Development lease only concerns subsurface oil and gas and does not appear, from the document, to have any effect on the surface of parks or on any use of the park as a park. In fact, the lease contains express restrictions on activities that would interfere with the use of the park as a park.

Our Supreme Court's reasoning in *Central Land Co v Grand Rapids*, 302 Mich 105; 4 NW2d 485 (1942), buttresses our decision. That case involved a deed restriction providing that certain real property would revert back to the grantor if the city of Grand Rapids ceased to use certain land or any part of the land "for park, highway, street, or boulevard purposes[.]" *Id*. at 107. The issue in that case concerned whether the operation of oil and gas wells was contrary to

those purposes, particularly the purpose of using the land as a park. *Id*. at 109. The Court answered that question in the negative, remarking that the defendants in that case "have taken rather extraordinary care in so operating the oil wells on the park property that this activity does not materially impair the use of the land for the purposes for which it was conveyed to the city." *Id*. at 110. That "extraordinary care" bears resemblance to restrictions imposed by Jordan Development Lease, including that "[n]o storage tanks are maintained on the property," that the pipelines were "for the most part, if not wholly," underground,[4] only a "small and not particularly unsightly or objectionable" structure was present at the location of each well, and the lease provided that the defendants were not to interfere with park facilities.[5] *Id*. at 110-111. The Court concluded that the record revealed no "real or substantial violation of the condition" that the land was to be used only, for among other purposes, park purposes. *Id*. at 113. "Neither the park property as a whole nor any substantial portion thereof is being used in any way or for any purpose which in any substantial degree interferes with the uses for which the property was conveyed to the city." *Id*.

Although the instant case does not involve a deed restriction, we find the discussion about park purposes in light of subsurface drilling activities to be analogous here, given that both *Central Land* and the instant case involve restrictions on using land for "park purposes." And, we note that the Jordan Development lease in the instant case takes even greater care about not disrupting park purposes than did the oil and gas development in *Central Land*. For instance, as noted above, the pipeline in this case is to remain underground, and Jordan Development may not erect any structures on the surface of the land.

For many of the same reasons, we conclude that the Sunoco Pipeline agreements will not alter the nature of Bloomer Park. Sunoco Pipeline received a 25-foot-wide easement "to construct, install, maintain, operate, repair, inspect, alter, protect, change the size of, relocate, replace in whole or in part, remove and abandon a pipeline or pipelines and other appurtenant facilities." Sunoco Pipeline expressly promised that it would not interfere with normal park operations. And, it utilized a horizontal boring method that eliminated the need to dig a trench from the surface of the park. Sunoco Pipeline also agreed to "engage in Best Tree Management and Preservation Methods recognizing the park nature of the Right-of-Way when engaged in trimming and removal." We detect no risk to the nature of the public park posed by the Sunoco Pipeline easement, and no conversion of a public park to another use, Charter § 11.8(1). Much like the agreement with Jordan Development, the easement contains provisions to protect the nature of Bloomer Park as a park. Furthermore, Charter § 11.8(2) provides for the lawfulness of an "existing use of a park or open space on the effective date of this section." The plain language of the Sunoco Pipeline agreements confirms that it replaced an easement predating Charter § 11.8(2); in other words, even assuming there was any "use" of the park, it was an existing use that was allowed under the plain language of Charter § 11.8(2).

---

[4] In contrast, the totality of the pipelines at issue in this case are to be, from the terms of the lease, underground.

[5] In the present case, we note that the Jordan Development Lease prohibits structures of any kind.

Because the plain terms of the Jordan Development lease and the Sunoco Pipeline agreements comport with the clear and unambiguous language in MCL 117.5(1)(e) and Charter § 11.8, the circuit court properly granted defendants summary disposition under MCR 2.116(C)(10).[6]

Affirmed.

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Jane M. Beckering

---

[6] Because of our resolution of this issue, we need not consider the remaining arguments raised on appeal or the circuit court's alternative grounds for granting summary disposition.