State, *ex rel.,* v. Dodge City.

No. 27,298.

THE STATE OF KANSAS, ex rel. E. C. MINNER, County Attorney,
*Appellee,* v. THE CITY OF DODGE CITY, *Appellant.*

#### SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS—*Authority to Maintain City Tourist Camps.* A city may in its discretion maintain a municipal or city tourist camp, providing such buildings, facilities and conveniences and making such charge therefor as the governing body of such city may determine. (Substitute for house bill No. 27, Laws of 1927.)

2. SAME—*Maintenance of Camp in City Park.* And further, a city may, if it be deemed expedient, maintain such tourist camp in any park of the city.

3. SAME—*Operation of Tourist Camp—Disposition of Receipts.* Receipts from the operation of tourist camps shall be used to defray the expenses of such camps, and any surplus therefrom shall be paid into the general fund or park fund of the city as the governing body of such city may direct.

Appeal from Ford district court; ROSCOE H. WILSON, judge *pro tem.* Opinion filed April 9, 1927. Reversed.

*Carl Van Riper,* of Dodge City, for the appellant.
*A. L. Moffat,* of Kinsley, and *E. C. Minner,* of Dodge City, for the appellee.
*Albert B. Martin,* of Lawrence, as *amicus curiæ.*

The opinion of the court was delivered by

HOPKINS, J.: This action involves the question whether a city park dedicated for general park purposes may be used for operation of a tourist camp. The action was one in quo warranto to oust the city from maintaining and operating such a camp. Plaintiff prevailed and defendant appeals.

It is contended that the operation and maintenance of the tourist camp is a commercial enterprise in which the city has no power to engage, and that maintenance of the camp in the city park is a diversion and misuse of the park—therefore, unauthorized and illegal.

Briefly, the facts are these: Dodge City is a city of the second class. In the year 1900 certain tracts of land were deeded to it for general park purposes. The money necessary for the purchase of such land was raised by popular subscription except $500 which was contributed from the city treasury. Some money raised by popular subscription remaining after the purchase had been made,

Municipal Corporations, 28 Cyc. p. 938 n. 48 new.

was used in clearing the land, laying out a race track, etc. In 1917 an automobile camp was laid out in the park and in 1923 various conveniences for the benefit of the traveling public having been constructed, a charge was made for the use of the automobile grounds. In the summer of 1925 the city constructed fifteen one-room cottages for the convenience of the tourists, costing approximately $1,835. Another cottage (cook house), costing about $650, was constructed at the same time. These cottages were not paid for by the city, but were built under an agreement whereby the camping receipts should be turned over to the builder until their cost had been paid for. The city made a charge of thirty-five cents per day for camping privileges and a charge of one dollar per day for the use of a cottage. A small grocery store is operated in the park under the management of the park custodian, who is also a commissioned police officer. The store of goods is his own and he pays no city license for the operation of the store. All moneys received from the tourist camp are turned over to the park commissioner to be placed in the park funds for the maintenance of the camp; whatever is left, if any, being used for general upkeep of the camp. There was evidence that two private tourist camps, located just outside the city limits, could amply care for the tourist traffic.

Numerous authorities, cited by plaintiff in support of the contention that in operating the tourist camp the city engaged in a commercial enterprise, need not be analyzed. A very similar question was considered in *Bailey v. City of Topeka,* 97 Kan. 327, 154 Pac. 1014, which involved the use of Gage park. It was there said:

"Clearly, it is not inconsistent with the conditions imposed by the donor of the property that visitors to the park should be afforded facilities for obtaining refreshments, for boating and for bathing. No reason exists why they should not pay a fair price for what they eat or drink, or for the boating or bathing equipment they use. The city might through its employees furnish these conveniences directly, collecting reasonable charges therefor. The fact that a profit resulted would not render the transaction objectionable. The incidental revenue would not characterize the transaction as commercial rather than governmental. Substantially the same result is accomplished by authorizing certain individuals to attend to the business of supplying the wants of the public with respect to the matters referred to, retaining so much of the proceeds as will fairly compensate them for their services and investment, and turning the residue over to the city." (p. 329.)

In a brief filed on behalf of the League of Kansas Municipalities, it is stated that of some 558 incorporated cities in the state, about 200 operate municipal tourist camps. Since the advent of automo-

biles, travel by means of such vehicles has increased, until at the present time many persons, excursion bound for pleasure and often on business, use automobiles as a means of conveyance. Many touring the country for sight-seeing or on vacation trips are inclined to put up at a tourist camp in preference to storing their automobiles in a garage and patronizing a hotel every time they stop. It has become the custom to carry the necessary camping equipment to enable the traveler to stop at night at any place where a tent may be pitched and water, food, and other living necessities obtained. It is only natural that travelers should spend the night in or near some city so that there may be opportunity to buy such articles as are necessary. In the beginning, it was not often that a tourist could secure private property for this purpose, nor would it have been a paying proposition for an individual to operate a "pay" camp. This caused cities to set aside tracts in their municipal parks for the purpose of affording tourists a place on which to pitch their tents and put up for the night. This practice has grown until nearly every city of consequence has established a tourist camp, and in most cases as a part of the city park. It was natural that the cities should do this. The power to do so was seldom, if ever, questioned, and it was not until the tourists became so numerous that private camps could be established and maintained at a profit, that the maintenance of such camps was considered a business. The original concept of a city park has by usage during the last twenty years broadened to include the maintenance of a tourist camp. Fireplaces are commonly provided in city parks for the use of picnickers, and there is no inherent reason why facilities of a like nature should not be provided for tourists. The tourist camp is part and parcel of the modern municipal park. Its maintenance as a part of the modern municipal park is not different in principle than maintenance of a swimming pool therein about which there is no longer contention.

In the instant case it is perfectly apparent that the city was not operating the tourist camp for revenue purposes, and the court would have been justified had it, in the exercise of its discretion, rendered judgment for the city. The matter is now of little consequence, because the recent legislature enacted a statute providing that:

"The governing body of any city . . . shall have the power, and may, in its discretion, maintain a municipal or city tourist camp, providing such buildings, facilities and conveniences and making such charge therefor as such governing body may determine. That if deemed expedient and proper, . . .

such tourist camp may be maintained in any park of the city. Cities are authorized to acquire by lease or purchase such lands as may be necessary upon which to establish and maintain tourist camps." (Substitute for house bill No. 27, Laws 1927.)

The act provides that:

"The receipts from the operation of tourist camps shall be used to defray the expenses of such camps, and any surplus therefrom shall be paid into the general fund or park .fund of the city, as the governing body may direct." (Substitute for house bill 27, Laws 1927; effective March 14, 1927.)

But see *Kennedy v. City of Nevada*, 281 S. W. 56 (Mo. App.), where on consideration of the question whether a municipality had the power to expend its funds to provide entertainment and extend hospitality or to furnish social pleasures either to its citizens or invited guests, it was held that, generally speaking, such a fund is not within the terms "corporate," and that the purchase of lands within a city by the municipality for the purpose of using it for a tourist camp was not a purchase for a municipal purpose under article 10, section 3, of the Missouri constitution.

The judgment is reversed and the cause remanded with directions to render judgment for the defendant.