### SCHMOLDT v. CITY OF OKLAHOMA CITY et al.

No. 21459. Opinion Filed Sept. 9, 1930.

Eugene Jordan, for plaintiff in error.

M. W. McKenzie, for defendants in error.

SWINDALL, J. This is an appeal from an order and judgment of the district court of Oklahoma county, Okla., denying plaintiff's application for a temporary injunction, and also from the judgment of said court whereby plaintiff in error, who was plaintiff below, was denied relief in the way of a permanent injunction and in the cancellation of certain bonds voted by a majority of the qualified property owners and tax paying voters of Oklahoma City, at an election held on July 30, 1929.

Certain issues relating to this bond election were decided by this court in Ruth v. Oklahoma City, 143 Okla. 62, 287 Pac. 406, which it is not necessary to further discuss in this opinion.

The parties, plaintiff in error and defendants in error, sustain the same position in this appeal as they did in the trial court, and will hereafter be referred to as plaintiff and defendants.

In this action the plaintiff makes only one contention as follows:

"Funds arising from an indebtedness authorized to be created under the provisions of section 27, art. 10, of the Constitution for public utility purposes, to be owned exclusively by the municipality, specifically a public park, may not be expended in equipping a municipally owned aviation airport."

The defendant contends, among other things:

"That a public park is a public utility within the meaning of the provisions of section 27, art. 10, of the Constitution, and that any improvements, buildings, or equipments thereon which are deemed to be to the best interest, welfare, and happiness of the inhabitants of the municipality, may be constructed, and that this includes the power to locate on said park an aviation airport with all necessary and proper equipments, buildings, and appurtenances thereto."

The election was called and held to vote on the issuance of bonds to provide funds for the purpose of acquiring, owning, maintaining, and beautifying real property for public parks with the privilege of locating thereon aviation airports with all necessary and proper equipment, buildings, and appurtenances thereto, to be owned exclusively by the city of Oklahoma City, and to provide for levying and collecting an annual tax in said city for the payment of the interest on and the principal of said bonds at maturity.

It is conceded that, under the holdings of this court in the case of Barnes, Mayor, v. Hill, 23 Okla. 207, 99 Pac. 927, a public park is a "public utility," within the meaning of that term as used in section 27 of art. 10 of the Constitution, and that an incorporated city may in the manner provided in said section of the Constitution issue bonds for the purpose of constructing sidewalks around walks and driveways through its public park, and for the paving of the streets surrounding the same. The same holding relative to a park being a public utility within the meaning of the term as used in section 27 of art. 10 of the Constitution was announced in the City of Ardmore v. State ex rel. Best, 24 Okla. 862, 104 Pac. 913; and that a city may properly vote bonds for the improvement of such park in the manner provided for in said section.

So the only issue for us to determine here is, whether or not an aviation airport with all necessary and proper equipment, buildings, and appurtenances thereto, is a park improvement, and may be paid for out of funds derived from the sale of bonds issued and sold for the purpose of public park improvement. In other words, Is the using of a portion of the funds derived from the sale of bonds voted to provide funds for acquiring, owning, maintaining, and beautifying real property for public park purposes an inconsistent use of the property for public park purpose?

It is a matter of public knowledge that the erection of museums, art galleries, zoological and botanical gardens, conservatories, auditoriums, veterans' memorial halls, tennis courts, swimming pools, and the like in public parks, is common and that their establishment has not been regarded as a diversion from legitimate park uses, but, on the contrary, such buildings have been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit. Slavick v. Hamilton (Cal.) 257 Pac. 60; State ex rel. Minner v. Dodge City, 123 Kan. 316, 255 Pac. 387, and cases there cited.

It appears to us that the public would receive much more pleasure, recreation, amusement, and benefit by being permitted to attend a musical or other educational program rendered by radio or otherwise in a conservatory or veterans' hall, in a public park, where those who are not financially able to patronize a playhouse, where an admission fee is charged, and that the public would enjoy an airplane exhibition to see an airplane glide gently to the earth and take to the air again as gracefully as an eagle in its flight, and ponder over the wonderful accomplishments of the airplane, which appears to be yet in its infancy, than they would strolling through a zoological garden viewing the reptiles, fowls, and animals.

The object of municipalities maintaining public parks, at a large expense, is to furnish pleasure, recreation, and educational benefit to the inhabitants of the town or city and visitors and travelers who sojourn or pass through such towns and cities.

The term "public utility," as used in section 27 of art. 10 of the Constitution, was before this court for construction in the case of State ex rel. Edwards v. Millar, Mayor, et al., 21 Okla. 448, 96 Pac. 747, and there held that sewers are "public utilities," within the meaning of the term as used in the Constitution, following Valley City Salt Co. v. Brown, 7 W. Va. 191, in which the term "public utility" is construed as being synonymous with "public use."

In the case of Dysart v. City of St. Louis, 11 S. W. (2) 1045, the Supreme Court of Missouri said:

"The expenditure of public funds for an airport is for a public use within constitutional limitations to such uses."

In the body of the opinion, the court uses this language:

"The question of whether the acquisition and control of a municipal airport is a public purpose within the purview of the constitutional principle heretofore adverted to is obviously a new one. The courts which have had occasion to consider it have, however, answered in the affirmative. Wichita v. Clapp, supra; State ex rel. Lincoln v. Johnson (Neb.) 220 N. W. 273; State ex rel. Hile v. Cleveland, 26 Ohio App. 265, 160 N. E. 241; and no court of last resort, so far as we are advised, has ever held the contrary. Not only that, but the governmental nature of the function involved is given tacit recognition in numerous recent statutory enactments, both state and federal: Ga. Laws 1927, p. 779; Kan. Rev.

Stat. 1923, 3-110; Conn. Pub. Acts 1925, chap. 249; Mass. Laws 1922, chap. 534, sec. 57; Mont. Laws 1927, chap. 20; Ohio Gen. Code, 15-3677; Pa. Act No. 328 of 1925 (Pa. Stat. Supp. 1928, 460 C-1 to 460 C-3); Act 254 of the 69th Congress (the Federal Air Act, U. S. Code title 49, sec. 171 et seq.). We have no doubt as to the soundness of the view which obtains."

The issue here presented was very recently passed upon by the Supreme Court of the state of Nebraska in State ex rel. City of Lincoln v. Johnson, State Auditor, 220 N. W. 273, where it was held that:

"An equipped municipal aviation field is both a 'public service property' and a 'public utility' within the meaning of the Lincoln Home Rule Charter, and the establishment of such a field is a governmental purpose for which bonds may be voted and taxes levied and collected."

Also, the Supreme Court of the state of Kansas in City of Wichita v. Clapp, 125 Kan. 100, 263 Pac. 12, held:

"The devotion of a reasonable portion of a public park to airport (aviation field), for recreation and other attendant purposes, comes within the proper and legitimate uses for which public parks are created."

Under the authorities from our sister states passing upon this question, it seems to be settled by the courts of last resort in the states that have passed upon this proposition that a city may use a portion of its park as an airport or aviation field.

Of course, the funds derived from the sale of the bonds involved in this action must be used for the purposes designated, and such landing fields, hangars, or buildings as may be constructed must be ancillary to the complete enjoyment by the public of the property set apart for their benefit, but, in the present day, we feel that it would be doing violence to the Constitution to restrict the uses for which the bond funds might be used to lessen the purposes for which they were used in constructing and maintaining a park 20 years ago. What was enjoyment to the public then is enjoyment to the public now, but there have been numerous amusements brought about by the advancement of science and art which did not then exist, since this court held 20 years ago that a convention hall, to be owned, controlled, and used exclusively by a city, to accommodate public gatherings of the people of a city, and for such other public uses as may be designated by the mayor and city council, is a "public utility," and that an incorporated city may in the manner provided in section 27 of art. 10 of the Constitution issue bonds for the purpose of constructing sidewalks around, walks and driveways through its public park, and for the paving of streets surrounding the same, then it has the unquestionable right at this time to use a portion of the funds derived from the sale of its bonds in this case for the purpose of constructing a landing field and hangars for airplanes, or installing radios in its public buildings, which would certainly add to the pleasure and amusement of the public as much or more as would using the driveways and sidewalks.

Complaint has been made that municipalities are mortgaging the homes of the inhabitants of the city for 25 years by permitting excessive bond issues. It was the evident purpose of the framers of the Constitution that only property owning, tax paying electors should have the right to vote bonds for the purpose of purchasing or erecting public utilities, to keep the bonded indebtedness under the control of a majority of the property tax paying electors, and while it may be true that excessive bond issues are voted in some municipalities, this is a matter over which we do not have control. If a bond issue is proposed that is excessive, or which is not desired, then a majority of the property owning taxpayers who are also qualified electors in the municipality may prevent the issuance of such bonds by going to the polls at the time and place fixed for holding the election and voting against such issue, and if the tax paying electors of a city do not desire to exercise the right guaranteed to them by the Constitution to express their views in favor of or against such bond issue, it is not for us to take on their burdens by saying that they are being excessively taxed to carry on the public utilities and other public affairs of the city. On the other hand,

"Where it is shown that funds derived from the sale of bonds about to be issued will be devoted to unlawful purposes, and where it is further shown that said funds may not properly be applied to the purposes for which they were voted, the issuance of the bonds will be enjoined." Town of Afton et al. v. Gill, 57 Okla. 36, 156 Pac. 658.

So, in this case, if the issue for our determination were that the funds derived from the sale of bonds about to be issued will be devoted to unlawful purposes, or that said funds were not being properly applied to the purposes for which they were voted, it would be our duty, when called upon, to see that the funds voted by the property tax paying electors were not used for purposes for which they were not voted. Further than this, the judicial branch of the government should not interfere with

the will of the qualified tax paying electors, as expressed by a majority vote, in carrying on their governmental functions in a way and manner authorized by law, so long as they keep within the constitutional requirements and limitations.

The only question for us to determine is whether or not the city of Oklahoma City has a right to use any portion of the funds derived from the sale of the bonds voted to purchase or maintain a park in constructing a landing field for airplanes, and, as said before, if a city may use a portion of such funds for building sidewalks around, walks and driveways through its park for the amusement of the public, we see no good reason for holding the city cannot expend a part of its funds in maintaining an airport for the pleasure and amusement of the public. After a careful examination of the foregoing authorities, we are of the opinion that the findings and judgment of the trial court are correct and should be, and they hereby are, affirmed.

MASON, C. J. and HUNT, RILEY, HEFNER, CULLISON, and ANDREWS, JJ., concur.

LESTER, V. C. J. and CLARK, J., dissent.

LESTER, V. C. J., (dissenting). I dissent for the reason that I do not think that an airport is a public utility within the contemplation of section 27, art. 10, of the Constitution of the state of Oklahoma.

Section 26, art. 10, of the Constitution of the state of Oklahoma provides:

"No county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at an election to be held for that purpose, nor in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount including existing indebtedness in the aggregate exceeding five per centum of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness: Provided, that any county, city, town, township, school district, or other political corporation, or subdivision of the state, incurring any indebtedness, requiring the assent of the voters as aforesaid, shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also

to constitute a sinking fund for the payment of the principal thereof within 25 years from the time of contracting the same."

There it is seen that the creation of an indebtedness beyond the income and revenue of a municipal unit for the current year may be authorized where three-fifths of the voters thereof voting at an election may create a debt, but not in excess of five per centum of the valuation thereof based on the last assessment for the previous year.

Section 27 of art. 10 of the Constitution of this state provides:

"Any incorporated city or town in this state may, by a majority of the qualified property tax paying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section 26 for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city; Provided, That any such city or town incurring any such indebtedness requiring the assent of the voters as aforesaid, shall have the power to provide for, and, before or at the time of incurring such indebtedness, shall provide for the collection of an annual tax in addition to the other taxes provided for by this Constitution, sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within 25 years from the time of contracting the same."

Hence it is observed that in case of creating indebtedness for the purpose of purchasing or the construction of public utilities there is no debt limit; therefore, I believe that the framers of the Constitution had in mind only that class of public utilities that were absolutely necessary for the general welfare, comfort, convenience, and safety of the people generally of a city or town creating such indebtedness.

If a city or town without such debt limit may authorize the creation of an indebtedness for utilities of a speculative nature through the efforts of an interested and organized minority, it may produce an actual confiscation of the citizens' property and is fraught with great peril to the taxpayers.

In the instant case there were approximately in Oklahoma City, 35,000 qualified tax paying voters. There were cast for the bond issue 2,061; against, 1,609. Therefore, there were not more than one-eighth of the tax paying voters of Oklahoma City who participated in the election and less than one out of fifteen who favored placing the burden of this bond issue upon the taxpayers of Oklahoma City.

I view with great concern the injury that may follow from an intense action of an interested and ingenious minority in placing bond issues on the property of the citizens without limit. Under section 27, supra, bond issues for public utilities within the meaning of that section may more than equal the value of all the property of a city or town.

In my judgment bonds issued under section 27, supra, can only be authorized for the creation or repair of that class of utilities that are absolutely necessary for the safety, health, comfort, and convenience of the people generally of such city or town, and I do not think that a bond issue for an airport comes within that class or definition.

I cannot be blinded to the real purpose of the bond issue herein. Park purposes have heretofore been held by this court to be a public utility. I think in that case it would have been more reasonable to authorize an indebtedness for their creation under section 26, supra, which limits the amount of municipal indebtedness. However, in this case park purposes are only incidental to the main object, to wit, the erection of suitable buildings, the preparation of the ground for airport purposes; and the only excuse in calling it a bond issue for park purposes is to create a legal peg upon which to hang an unauthorized indebtedness.

In the case of Coleman v. Frame, 26 Okla. 193, 109 Pac. 928, this court said:

"It is almost the universal practice of the states of the Union in framing their Constitutions to place limitations upon the power of taxation by municipalities. This unlimited power to assess and collect taxation even for public utilities is not conferred upon municipalities by any state, so far as we are aware, except our own. Some states, such as Utah and Washington, permit municipalities to tax beyond the ordinary limit, for public utilities; but in these states public utilities are specifically confined by the Constitution to 'water, artificial light and sewers, when the works for such water, artificial light or sewers shall be owned and controlled by the municipalities.' Section 6, art. 8, Const. Wash. Section 4, art. 14, Const. Utah, is substantially the same as section 6, art. 8, of the Washington Constitution. It was for the purchase, construction, and repair of this class of public utilities the framers of the Constitution provided by section 27, supra, and the court will not by construction so broaden the term as to practically remove all restrictions upon the debt creating powers of the municipalities of the state."

As stated above, we have no debt limit on cities and towns where such debt is created for the purpose of purchasing, erect-ing, and repairing public utilities, owned solely by such city or town.

It is hereinabove noted some of the states specified the character of public utility by which a debt may be created; still, in the absence of a debt limit or a classification of utilities for which a debt may be created, we should apply the rule of reason and refuse to go beyond the classification generally accepted as such.

I believe it was the intention of the framers of our Constitution that bond issues without limit could not be authorized for the erection, purchase, or repair of public utilities unless such utilities were for the safety, comfort, and convenience of the people generally of the city or town proposing their issuance.

As pointed out in the instant case, there were less than one out of fifteen taxpayers voting for the bond issue. Of course, if this constitutes the required majority, there could be no objection to the validity of the bond issue on that account; however, it does show intense danger that might inure to the taxpayer for a too liberal construction to be placed upon what constitute public utilities within the meaning of section 27, art. 10, supra, in which there is no limitation of indebtedness, and therefore an active minority may create an indebtedness upon the taxpayers of the city or town which would more than equal every dollar's worth of property of such taxpayers in a city or town where the purported object of the bond issue is the promotion of a public utility. This policy will bankrupt the taxpayers of the city and town and benefit only the immediate beneficiaries of the bond issue.

If bonds of this character are permissible under our Constitution, the taxpayers of every city or town in the state are immediately threatened with confiscation of their property, because there is no debt limit provided in section 27, supra, and promoters of bonds and their beneficiaries are usually more vigilant than unsuspecting taxpayers.

Air travel will constantly become more safe, popular, and convenient, but why tax the already overburdened taxpayer in order to furnish conveniences for this new mode of travel? Why not just as well burden the taxpayer for accommodations for tourist camps, bus stations, and railroad depots.

It may also be urged that a great majority of tax paying citizens, who failed to vote upon a submitted bond issue under section 27, supra, have no right to complain of its burdens on account of noninterest by them in the election; but an interested minority

proposing such a bond issue often fails to inform the tax paying voter of his threatened and additional burdens. However, the unorganized majority have a right to repose in the Constitution of their state as a protection and shield against an unauthorized and illegal indebtedness. The Constitution protects the citizen and his property against the selfishness of the few, as well as the over enthusiasm of the many.

We have suddenly awakened in Oklahoma to the alarming burdens of taxation. However, we find that under the Constitution of the state of Oklahoma not more than 3½ mills can be levied for state taxes on an ad valorem basis, and that approximately 19/20ths of all total taxes are local in their nature, and the local taxes have been greatly increased by bond issues under sections 26 and 27, supra, and that unless a strict construction is placed on section 27, supra, which section is without debt limit, we will invite and encourage further bond issues under this section which will increase our taxes to an unbearable rate.

Judgment should be reversed, with instructions to render judgment in favor of the plaintiff below.