**CITY OF TULSA, Plaintiff,**

v.

**Mac Q. WILLIAMSON, Attorney General of the State of Oklahoma, Defendant.**

**No. 36677.**

Supreme Court of Oklahoma.

Oct. 29, 1954.

210

T. A. Landrith, Jr., City Atty., Edmund Lashley, John W. Hager, R. K. McGee and R. E. Lavender, Tulsa, for plaintiff.

Mac Q. Williams, Atty. Gen., Lynnie Clayton Spahn, Asst. Atty. Gen., for defendant.

WELCH, Justice.

This action presents the question whether the Attorney General as ex-officio Bond Commissioner of the State should be required in mandamus to approve a certain negotiable coupon bond issue of the City of Tulsa, Oklahoma.

It was the overall purpose of the city to purchase from the Thomas Gilcrease Foundation a certain extensive collection of American History and Art then owned by the Foundation in the City of Tulsa, and to thereafter house and maintain the same as a Public Museum in the City of Tulsa.

The purchase price was $2,250,000, which the city intended to pay by a bond issue pursuant to authority granted by Sec. 27, Art. 10 of the Constitution of Oklahoma. By proper resolution and ordinance the matter of issuing such purported bonds was submitted to a vote of the people of Tulsa, and the election favored the issuance of such bonds by substantially more than the

vote percentage required by law. There is no question on these points.

Three other questions, however, have arisen and it was the position of the Attorney General that he should not approve the bonds until these questions were judicially passed upon. This action commenced pursuant to proper resolution of the City of Tulsa presents for determination these three questions as follows:

"(1) Did the inclusion of the words 'operating and maintaining' in the ballot title render said proposed bond issue invalid?

"(2) Does the City of Tulsa have the right to issue bonds for the purpose of acquiring the collection of American History and Art owned by The Thomas Gilcrease Foundation?

"(3) Is the property to be acquired by the proceeds of the sale of these bonds a public utility within the meaning of Section 27 of Article 10 of the Oklahoma Constitution?"

The Thomas Gilcrease collection of American History and Art, among other things, contains the following:

"Priceless paintings—approximately 4000 of them. These are in many groups. For example—the documentary artists who lived with the Indians and painted them as they saw them, recorded their lives, customs and costumes, ceremonies and beliefs. Of this group is George Catlin, the first white artist to paint in what is now Oklahoma. Two hundred eighteen of his paintings, 42 pen and water color sketches and sketch book are in the collection. Other such artists who are well represented in the Gilcrease collection include Alfred Jacob Miller, John Mix Stanley, William de la Montagne Cary and dozens of others.

"Another group of painters are the Western Artists. The Gilcrease collections contain probably the finest, most selective collections in the world of paintings and sculpture of Frederic Remington and Charles M. Russell.

"Still another group is the contemporary Indian artists. More than 100 artists are represented by more than 500 paintings, including the finest work of the best artists, such as Acee Blue Eagle and Woodrom Crumbo. Other artists include Wimar, Bierstadt, Blakelock, Moran, Schreyvogel, Berninghaus, Eakins, Deming, Henri, Jarvis, Sharp, Audubon, King and a group of early colonial artists including Copley, Sully, Vanderlyn, Peale, etc., and later Healy, Homer, Whistler, etc.,

"A related collection of more than 150 pieces of sculpture by leading artists of America, in bronze, marble and wood, including work by Hoffman, Proctor, Kauba, Dallin, Shrady, Fraser, Borglum, MacNeil, Humphrise, Manship and MacMonnies, etc.,

"A priceless collection of more than 10,000 pieces extending in time from 3500 years ago to today, from clay-modeled fetish figures of the pre-historic peoples of Central America and Old Mexico, through almost 100 pieces of rare Mayan clay figurines, Tarascan figures and folk art, Aztec and Totonac sculpture, etc., to the Mound cultures of our own continent and down to works of art of modern Indians of today. This represents the finest handiwork created by ancient and modern Indians of the entire Western Hemisphere—giving the truest picture of the real nature of our land's first inhabitants, their way of life, their beliefs, their aspirations and highest accomplishments.

"A fabulous collection of hundreds of pieces of pre-Columbian gold and jade from Old Mexico and Central America. Rarest artifacts in existence today, since only a few pieces of the most exquisite handiwork of these natives were salvaged from the Spanish conquest and destruction.

"There is also a large collection of pottery from pre-historic times to the present, including rare Mound and Mimbres examples. There are hundreds of authentic costumes and tribal ornaments. There are implements and weapons and arrows, arrowheads and tomahawks, but these last are included

more as examples of fine handiwork rather than weapons. Everything connected with the American Indian in the field of artifacts is represented.

"A fine collection of rare worth and interest is the peace medal group, those marks of esteem and appreciation given the Indian leaders by the English rules and the Presidents of the United States.

"The library of the Gilcrease collection is almost beyond anyone's imagination. There are approximately 85,000 items in the library, of which an estimated 20,000 are extremely rare and precious. Included in this are the tremendously important Spanish conquest documents, original accounts of those little-recorded times. Also, there is a great collection of the material from the Five Civilized Tribes of American Indians. These and other groups offer limitless untapped resources for research material, causing one university authority to say he could see "100 doctorates" in the library's offerings.

"In addition to the manuscripts, there are books ranging from the first edition of the first complete book ever printed in the New World to early printings of Indian Territory and fine works of today. A listing of these is an introduction in history itself and a fabulous record. Folios, maps, prints, all the handiwork of man in the recorded word are in the Gilcrease collections, and add to the story of the paintings, artifacts, sculpture, etc.

"Manuscripts totaling over 10,000 pages, dating from 1526 and covering the Cortes period in Mexico.

"A few of the rare items in the manuscript and book collection is the letter signed by Diego Columbus, Christopher's son, which is his first letter ever to be sent from the New World, sent from Santo Domingo, in January 1512.

"Letters signed by Diego Columbus and Bartholome de las Casas, dated in 1519, written from the New World concerning the Christianization of the Indians of the land.

"A document signed by Hernando Cortes, an original manuscript of the first decree made by Cortes the day after capture of Mexico City, August 14, 1521.

"A document signed by Hernando De Soto, companion of Pizarro in Peru, and discoverer of the Mississippi River, issuing orders to fellow conquistador, Hernan Ponce de Leon, June 27, 1535.

"A letter from Thomas Jefferson expressing his concern over the State of the Union, July 1 and 2, 1776.

"The only original certified copies of the Articles of the Confederation and the Declaration of Independence outside the Library of Congress in Washington. These were ordered by the Continental Congress for the King of Prussia and are signed and attested by Benjamin Franklin and Silas Deane.

"The only known copy of the rarest book on Virginia, a poem by Christopher Brooks on a massacre there, it is a first edition and the first book of English poetry written about America, published in London in 1622.

"A copy of the first Bible printed in English, in the New World, published in Philadelphia by Robert Aitken, 1781. Bartholome de las Casas—complete set of the First Editions of his rare American Tracts, published in 1552. Bernaldez Codex, written by a friend of Columbus from the explorer's own account of his discovery of America, dated 1508–1510.

"Constitutions of the Thirteen United States of America, the most important of all of Benjamin Franklin's political publications. This book has been called the Magna Carta of Europe, unsurpassed as a legislative code in both the practical organization of a government and in the principles on which it rests. This was Franklin's own personal copy, and bears his coat of arms, dated 1783.

"The original document appointing Paul Revere messenger to the committee of safety, signed by General Warren, who was killed at the Battle of Bunker Hill eleven days later. Dated April the 29th, 1775.

"A key into the languages of the Americas, written by Roger Williams, Providence, New England, published in London in 1643.

"Champlains Explorations, published in Paris, 1632, which gives much on early history of Canada, life, manners and customs of Indians of Canada, New York and New England.

"Globus Mundi, dated 1509, written by Martin Waldseemuller, to describe his globe. One of the earliest maps upon which any portion `of America appears and in which appears the first time ever used—the word America.

"An Enquire into the truth of the Tradition Concerning the Discovery of America by Prince Madog ab Owen Gwynedd, about the year 1170, written by John Williams, LLD, London MDC-CXCI.

"The Case—only one other copy known to be in existence—Owanako, Chief Sachem or Prince of the Mohegan Indians, of New England. This is his letter to a gentleman in London, in 1704, and is an appeal to Queen Anne for an investigation of the eviction of the Chief and his people from their lands by the colonial government of Connecticut.

"First edition of the first complete book published in the American continent from the first American Printing Press, Mexico, 1543.

"Letter of Americus Vespuccius, giving an account of his third voyage, published in Strasbourg, in 1505.

"Earliest known American verse, Broadside Ballad from Virginia, 'James his Towne,' March 1623, by a gentleman in that country, to the tune of 'All Those That Good Fellows Be.'

"Letter from General George Custer, dated St. Paul, 1876, outlining plans for the campaign against Sitting Bull—which resulted in 'Custers Last Stand.'

"Complete Debry folio, earliest authentic pictures of the American Indians, in first editions of 'Grand Voyages' and 'Petits Voyages,' 1590–1634, published by the Debry family, of Frankfort."

It is shown that this collection has an actual and a salable value in very substantial excess of the amount above stated and that it is made available to Tulsa at this price only by reason of the philanthropic desire of the owner to see the collection perpetually maintained by the City of Tulsa in or as a public museum. It is also shown that Mr. Gilcrease has substantially endowed a trust with funds for the continuing maintenance of the collection as a museum, thus adding to the assurance that the above stated overall purpose of the City of Tulsa may and will be carried out.

Section 27, Art. 10, Oklahoma Constitution provides as follows:

"Any incorporated city or town in this State may, by a majority of the qualified property tax paying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city: Provided, That any such city or town incurring any such indebtedness requiring the assent of the voters as aforesaid, shall have the power to provide for, and, before or at the time of incurring such indebtedness, shall provide for the collection of an annual tax in addition to the other taxes provided for by this Constitution, sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

The question for our determination is whether the expenditure of the proceeds of this bond issue finds authority in this

constitutional provision. It does not appear that this court has heretofore considered the question whether such a museum could be included in the class of "public utilities" of a city in this State.

Generally, the term "public utility" as so used in the Constitution may well mean and include any installation, institution, thing or entity, consisting of property of some determinable value, capable of being maintained and owned exclusively by the municipality, which is useful and usable by the public for the general welfare, and which is not specifically incorporated or included in some other category or classification different from a public utility.

Usually in any case it is not necessary and is impracticable to state a wholly comprehensive definition of the term "public utility." Ordinarily, the cases dealing with the question have confined themselves to a determination of whether the thing under consideration did or did not come within the classification of a public utility, and we shall so consider and determine the question here. We are aided therein by former decisions in this and other courts.

It has been held that the term "public utility" includes a Convention Hall, State ex rel. Manhattan Const. Co. v. Barnes, 22 Okl. 191, 97 P. 997; a public park including walks and driveways therein—City of Ardmore v. State ex rel. Best, 24 Okl. 862, 104 P. 913; and Barnes v. Hill, 23 Okl. 207, 99 P. 927; fire stations and equipment and street cleaning equipment, Oklahoma City v. State ex rel. Edwards, 28 Okl. 780, 115 P. 1108; a burial ground and cemetery, Denton v. City of Sapulpa, 78 Okl. 178, 189 P. 532, 9 A.L.R. 1031; a municipal airport, Price v. Storms, 191 Okl. 410, 130 P.2d 523; a sewer system, Toohey v. Town of Canton, 177 Okl. 426, 60 P.2d 729; and Sharp v. Hall, 198 Okl. 678, 181 P.2d 972.

In this connection we observe the rule laid down in State ex rel. Manhattan Const. Co. v. Barnes, supra, that while the question whether a use is a public use is ultimately a question for judicial determination, where the legislative judgment has been declared as to whether a given use is a public use, that judgment will not be overturned by the courts, unless it is clearly apparent that the same is without reasonable foundation. 97 P. 1000.

We observe also that the Charter of the City of Tulsa vests in the Park Board the authority to build and maintain museums as incident to the operation of parks. It is definitely settled by decisions of this court that public parks are public utilities. In Schmoldt v. City of Oklahoma City, 144 Okl. 208, 291 P. 119, 120, the court held that a reasonable portion of a public park may be devoted to use as airport or recreation, as being "park improvement." In the opinion in that case the court said:

"It is a matter of public knowledge that the erection of museums, art galleries, zoological and botanical gardens, conservatories, auditoriums, veterans' memorial halls, tennis courts, swimming pools, and the like in public parks, is common, and that their establishment has not been regarded as a diversion from legitimate park uses, but, on the contrary, such buildings have been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit. Slavich v. Hamilton, 201 Cal. 299, 257 P. 60; State ex rel. Minner v. [City of] Dodge City, 123 Kan. 316, 255 P. 387, and cases there cited."

The plaintiff makes the point that the acquisition and ownership of this collection to be housed in a building and surrounded by grounds under the jurisdiction of the members of the Park Board of the City of Tulsa is an incidental park purpose, and is for that further reason a public utility. In Furlong v. South Park Com'rs, 320 Ill. 507, 151 N.E. 510, that court held that:

"Bill to enjoin South Park Commissioners from issuing bonds under Act March 3, 1905 (Laws 1905, p. 333), to repair and improve Fine Arts Building in Jackson Park, held not to show proposed bond issue to be for an unauthorized purpose; 'park purposes' not being confined to land, but meaning land ornamented and improved as a place of resort for the public."

In that case in effect the court upheld a bond issue to provide a convention hall, a school of industrial arts, women's memorial building, and an industrial museum or museum of architecture and sculpture.

In Slavich v. Hamilton, 201 Cal. 299, 257 P. 60, the court held that:

"It is matter of public knowledge that erection of hotels, restaurants, museums, art galleries, zoological and botanical gardens, conservatories, and the like in public parks is common."

The court in that case cited with approval its previous decision in Spires v. City of Los Angeles, 150 Cal. 64, 87 P. 1026, 1027, in which in holding that the City had a right to erect a public library in a public park the court said:

"As matter of public knowledge, we are aware that the erection of hotels, restaurants, museums, art galleries, zoological and botanical gardens, conservatories, and the like in public parks is common, and we are not pointed to any authority where it has been regarded as a diversion of the legitimate uses of the park to establish them, but, on the contrary, their establishment has been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit. To instance, in Central Park in New York City there is a museum of natural history and a metropolitan art museum; and in Golden Gate Park in San Francisco, a museum, children's playground, and buildings used in connection with it, and a conservatory. We mention simply these parks and particular features devoted to the public enjoyment, although many other parks might be mentioned where similar buildings have been erected."

In City of Cleveland v. Lausche, 71 Ohio App. 273, 49 N.E.2d 207, it was held:

"The maintenance and operation of a zoological garden by a municipal corporation is a proper municipal function and one for which it may lawfully expend public funds."

And in the body of the opinion it was said:

"* * * The purpose of a zoological garden is cultural and educational, and is an activity which a municipality clearly has a legal right to own and to operate."

We conclude the City of Tulsa is fully justified in considering the purchasing and maintaining of this extensive collection in or as a museum, to be and to constitute a public utility, and we conclude that such purchase for such use is in law a public utility within the meaning of the aforesaid section of the Constitution.

That would answer questions number (2) and (3) in the affirmative.

As to question numbered (1), the ballot title upon which this bond proposal was submitted to the proper voters read as follows:

"Shall the City of Tulsa, State of Oklahoma, incur an indebtedness by issuing its negotiable coupon bonds in the sum of Two Million Two Hundred and Fifty Thousand Dollars ($2,250,-000.00) to provide funds for the purpose of acquiring, owning, operating and maintaining, within or without the corporate limits of the City of Tulsa, all of the collection of American History and Art, owned by The Thomas Gilcrease Foundation, and located in The Thomas Gilcrease Museum and elsewhere, and the furniture and fixtures thereof, to be owned exclusively by said City for museum purposes, and levy and collect an annual tax, in addition to all other taxes, on all the taxable property in said City sufficient to pay the interest on said bonds as it falls due, and also to constitute a sinking fund for the payment of the principal thereof when due, said bonds to bear interest at not to exceed the rate of four per centum (4%) per annum, payable annually, and to become due serially within twenty five (25) years from their date."

We observe therein the words "operating and maintaining" and the subsequent words "for museum purposes."

It is difficult to say just what those words mean in the ballot title. They do explain that the city's purpose is not to buy this property as a speculation for profit, not to buy it for the purpose of resale, but to purchase and acquire it for museum purposes, that is, to maintain it in a museum or as a museum for the public. Of course there could have been no purpose to "operate" any of items of property included in this collection which were capable of being in some manner "operated." Referring back to some of the cases heretofore cited, when the municipalities there involved purchased light plants, or fire fighting apparatus or street cleaning equipment there was the intent to operate the same for the general welfare. It seems to us that the use of the word "operating" in this ballot title was almost, if not entirely, meaningless, and that the word "maintain" was used as being synonomous with the word "operating," and that both amounted to mere surplusage since there was no plan or purpose to use any part of the proceeds of this bond issue to in any manner operate or maintain these properties in a museum.

It was well known and well stated that the purchase price of the Gilcrease collection was $2,250,000. It is expressly stipulated herein that no part of this sum is to be used or was ever intended to be used to pay any future maintenance expense of this museum property.

■ It is not conceivable to us that the use of these quoted words in the ballot title could have been misleading to the voters, or could have been understood by any one as attempting to set out any alleged or improper use of the proceeds of the bond issue.

In the case of Anselmi v. City of Rock Springs, 53 Wyo. 223, 80 P.2d 419, 423, 116 A.L.R. 1250, this wholesome rule was stated, "It has been held that courts must, as a rule, whenever possible, uphold the validity of municipal bond elections." Citing In re Validation of East Bay Municipal Utility Dist. Water Bonds of 1925, 196 Cal. 725, 239 P. 38; Bullitt v. City of Louisville, 213 Ky. 756, 281 S.W. 1031.

If that rule applies generally as to elections then it should apply with even more force, or should more readily apply, in a case where the only suggested irregularity of the election was the appearance in the ballot title of words of surplusage which could not have misled the voters, but merely served to explain the use to be made of the property after purchase with the proceeds of the bond issue. The last case cited contains extensive discussion along this general line to which we refer, but which we consider unnecessary to be here quoted at length. On this point see also the notes following the Anselmi case in 116 A.L.R. 1258.

■ Even errors in the ballot title need not necessarily invalidate the election where that conclusion is justified by the overall unimportance of the errors. State v. City of West Palm Beach, 1937, 127 Fla. 849, 174 So. 334. See, also, Spano v. City of Middletown, 1938, 169 Misc. 338, 7 N.Y. S.2d 14, and McQuillian on Municipal Corporation, 3rd Ed. Sec. 40.14.

■■ For the reasons stated, and upon the authorities cited, we conclude that the use of these quoted and questioned words in the ballot title had no substantial effect at all upon the election, and did not invalidate the election nor have any effect upon the proposed bond issue.

At the beginning of this opinion we quoted the three questions involved and set them out by consecutive numbers as they were presented in the pleadings and briefs of the parties, and having considered and determined each of them we now specifically decide and answer quoted question No. (1) in the negative, and we determine and answer questions (2) and (3) in the affirmative.

Therefore, having determined the validity of the bond election and of the proposed bond issue, it is our duty to direct the Attorney General, as ex-officio Bond Commissioner of the State of Oklahoma, to fully approve the proposed bond issue here involved.

Writ granted.

HALLEY, C. J., JOHNSON, V. C. J., and DAVISON, ARNOLD, WILLIAMS and BLACKBIRD, JJ., concur.

CORN, J., dissents.