BEHRENS, et al., Appellants
v.
CITY OF SPEARFISH et al., Respondents

(175 N.W.2d 52)

(File No. 10695.  Opinion filed March 5, 1970)

**Hanley, Wallahan, Driscoll & Murray,** Rapid City, for plaintiffs and appellants.

**Gary R. Richards,** Spearfish, **Overpeck, Hamblin & Mueller,** Belle Fourche, for defendants and respondents.

HANSON, Judge.

This is an action to restrain the City of Spearfish from operating or furnishing motel accommodations, cabin units, and rental sites for tents and trailers as part of its park facilities. The appealing plaintiffs are residents, taxpayers, and owners of motels, lodges, and cabins in Spearfish. They contend the city has no express or implied power to own or operate a cabin or tourist camp.

The City of Spearfish is located at the northern edge of the Black Hills of South Dakota. Since 1900 it has maintained a public park for the use, benefit and enjoyment of its residents, visitors, tourists, and students of Black Hills State College. The park is located within the city limits in a scenic spot along the banks of Spearfish Creek.

A pavilion has been maintained in the park for over 50 years where dances and meetings are held. Another smaller brick building is maintained for the use of smaller groups such as the Rifle Club and Boy Scouts. There is a bandstand for public concerts which has been rebuilt several times during the past

50 or 60 years. There are large open play areas equipped with swings, slides, teeter-totters, horseshoe pits, and observation bridge over the creek, and tennis courts. There are picnic areas with sheltered stoves, fireplaces, and tables. Toilets and washrooms are provided for public use.

In addition, the City Park includes a camping area containing rental sites for tents and trailers. Included in this portion of the park are 35 cabins which are rented out during the summer season to tourists, hunters, and fishermen at modest rates. Eleven of the cabins are not modern and are rented to college students attending summer sessions. The first three cabins were constructed in 1926 by the Spearfish Commercial Club and donated to the city. The others were all constructed on or before 1930 when there were relatively few similar private facilities of this nature available. All of the activities of the city park are combined into one operation under the management of a Park Superintendent and the revenue from all facilities is used by the city to maintain, improve and enlarge the park.

There are few cases directly dealing with the power of a municipality to establish or maintain a tourist camp as a public park facility. Two of the leading cases exemplify the contentions of the respective parties to this action. Plaintiffs cite and rely on Kennedy v. City of Nevada (1926), 222 Mo.App. 459, 281 S.W. 56, which was an action to restrain the city from operating a nuisance. The alleged nuisance was a tourist camp operated by the City of Nevada on a block of land. The waste from the tourist camp was discharged into an open ditch or gutter which gave forth vile and nauseating odors. In granting the injunction the court quoted with approval from 19 R.C.L. pp. 768, 770 as follows: "It is well settled that a municipal corporation has only such powers as are clearly and unmistakably granted to it by its charter or by other acts of the Legislature, and consequently can exercise no powers not expressly granted to it, except those which are necessarily implied or incident to the powers expressly granted and those which are indispensable to the declared objects and purposes of the corporation. Any fair and reasonable doubt concerning the existence of the power,

or any ambiguity in the statute upon which the assertion of the power rests, is to be resolved against the corporation and the power denied." In denying the contention that a tourist camp was a public park the court went on to say: "The record shows that this camp was maintained for the accommodation of people who traveled through the country in automobiles; that no one used it except people so traveling; that there was a charge made in connection with its use by the traveler if he stayed more than three days. It would appear that it was a place to stop and rest, to cook meals, and to spend the night; provision for these being furnished. There were also furnished shower baths and toilets. It can hardly be said that ground devoted to such purposes and for the exclusive use of transients and non-residents of the city is a public park * * * The operation of a tourist camp, whether the city receives any compensation therefrom or not, especially where the inhabitants of the city are excluded, is certainly not a public business. The evidence shows that these grounds were used substantially as an outdoor hotel, and no one would contend that a municipality would have the implied authority to operate a hotel for the benefit of transients."

On the other hand, the city cites the other leading case of State ex rel. Minner v. Dodge City (1927), 123 Kan. 316, 255 P. 387, which is factually similar to the present case in the following particulars: In 1900 certain tracts of land were deeded to Dodge City for general park purposes; in 1917 an automobile camp was established in the park; in 1923 the automobile camp was improved and a charge was imposed for the use of such conveniences; in 1925 the city constructed 15 one-room cottages which were paid for out of rental receipts; a small grocery store was also operated under the management of the park custodian; all of the money received from the tourist camp was used to maintain and improve the park. There was also evidence that at time of trial in 1927 there were private tourist camps near Dodge City which could amply care for all the tourist traffic. In approving of the operation of a tourist camp by Dodge City as a feature of its municipal park the Kansas court reasoned as follows:

"Since the advent of automobiles, travel by means of such vehicles has increased, until at the present time many persons, excursion bound for pleasure, and often on business, use automobiles as a means of conveyance. Many touring the country for sight-seeing or on vacation trips are inclined to put up at a tourist camp in preference to storing their automobiles in a garage and patronizing a hotel every time they stop. It has become the custom to carry the necessary camping equipment to enable the traveler to stop at night at any place where a tent may be pitched and water, food, and other living necessities obtained. It is only natural that travelers should spend the night in or near some city so that there may be opportunity to buy such articles as are necessary. In the beginning, it was not often that a tourist could secure private property for this purpose, nor would it have been a paying proposition for an individual to operate a 'pay' camp. This caused cities to set aside tracts in their municipal parks for the purpose of affording tourists a place on which to pitch their tents and put up for the night. This practice has grown until nearly every city of consequence has established a tourist camp and, in most cases, as a part of the city park. It was natural that the cities should do this. The power to do so was seldom, if ever, questioned, and it was not until the tourists became so numerous that private camps could be established and maintained at a profit that the maintenance of such camps was considered a business. The original concept of a city park has by usage, during the last 20 years, broadened to include the maintenance of a tourist camp. Fireplaces are commonly provided in city parks for the use of picnickers, and there is no inherent reason why facilities of a like nature should not be provided for tourists. The tourist camp is part and parcel of the modern municipal park. Its maintenance as a part of the modern municipal park is not different in principle than maintenance of a swimming pool therein about which there is no longer contention."

Every municipality in this state is empowered to establish, improve, maintain and regulate public parks within or without its corporate limits. SDCL 9-38-1. In construing the extent of this permissive power our court has liberally construed the term "public parks" and the uses to which such property may be devoted. In LeFevre v. Board of City Commissioners of Brookings, 65 S.D. 190, 272 N.W. 795, the expenditure of public funds by the City of Brookings was approved to construct a swimming pool and bathhouse in its city park under its general power to establish and improve "public parks". In doing so the court said: "There can be no disagreement as to the general rule that municipal authorities cannot divert park property from park purposes. The question of the use to which parks may be devoted has arisen in other jurisdictions, and it has been held that municipalities may use parks for tennis courts, baseball diamonds, race tracks, tourist camps, golf courses, libraries, memorial buildings, museums, art galleries, zoological and botanical gardens, and other recreational and educational facilities. * * * Park purposes are not confined to tracts of land kept in grass and trees, but extend to the improvement of tracts as places of recreation and amusement of the public." The court went on to point out the "use to which park property may be devoted may depend to some extent upon the manner of acquisition. A less strict construction is adopted where a park property is purchased or condemned by a municipality than upon dedications made by individuals." The same broad view of "public park use" was followed in approving the acquisition of land by the City of Vermillion for "a municipal golf course and for city park purposes". City of Vermillion v. Hugener, 75 S.D. 106, 59 N.W.2d 732.

Other jurisdictions have approved of divergent use of park property: lease of park property for the construction of a mineral springs hotel, Harter v. City of San Jose, 141 Cal. 659, 75 P. 344; airports, City of Wichita v. Clapp, 125 Kan. 100, 263 P. 12, 63 A.L.R. 478 and Schmoldt v. City of Oklahoma City, 144 Okl. 208, 291 P. 119; a veterans memorial building to provide a meeting hall for patriotic organizations, Slavich v. Hamilton, 201 Cal. 299, 257 P. 60, in which the court observed "it is a

matter of public knowledge that the erection of hotels, restaurants, museums, art galleries, zoological and botanical gardens, conservatories, and the like in public parks is common"; construction of auditorium and buildings for exhibition of livestock, Lewis v. City of Fort Worth, 126 Tex. 458, 89 S.W.2d 975; and in County of Cameron v. Wilson, 160 Tex. 25, 326 S.W.2d 162, the county was authorized to construct a trailer park in its public park because "a county may establish and maintain a public park. As an incident thereto, it may construct and maintain toilets and sanitary facilities. It may also provide parking space for motor vehicles and electricity for lights, fans and other mechanical appliances. A trailer park is nothing more than a place where parking space, sanitary facilities and electricity are supplied to those who make use of house trailers while traveling about the country for recreational or business purposes." Also see annotation "Uses to which park property may be devoted" in 63 A.L.R. 484, supplemented in 144 A.L.R. 486; and "Maintenance or regulation by public authorities of tourist or trailer camps, motor courts, or motels" in 22 A.L.R.2d 774.

According to SDCL 41-16-2 the "boards of county commissioners of the several counties of this state or the governing body of any municipality therein may co-operate with the game, fish and parks commission, or with each other, in the acquisition, development and maintenance of parks and recreation areas within their respective counties or adjacent to their respective municipalities, and are hereby empowered to purchase land, equipment and materials and to hire services and labor in order to effectuate such co-operation." In this connection SDCL 41-17-4 authorizes the game, fish and parks commission "to purchase, construct or otherwise acquire, or to contract for the feasibility survey, construction, completion, equipping or furnishing of any recreational facilities within any state park, and including by way of illustration but not by way of limitation, hotels, lodges, cabins, swimming pools, golf courses, restaurants, commissaries and other revenue producing recreational facilities whenever the commission deems such recreational facilities are necessary and feasible." By expressly authorizing municipalities to acquire, develop and maintain park projects such as "hotels, lodges,

cabins, swimming pools, golf courses, restaurants, commissaries, and other revenue producing recreational facilities" in cooperation with the state game, fish and parks commission our legislature has expressed a liberal view of permissible public park use.

■ In granting municipalities the power to establish, improve, and maintain public parks our legislature has never prescribed the use to which such property may be devoted. Nor has it proscribed or limited such use since the decision of this court in LeFevre v. Board of City Commissioners of Brookings, 65 S.D. 190, 272 N.W. 795. It follows that our legislature intended to vest each municipality in the state with a measure of discretion in determining the use to which public park property may be devoted. As the needs of each community vary so will the use of park property vary.

■ The Spearfish city park was not acquired by donation therefore a strict construction on its use is not dictated by private dedications. Our legislature has clearly expressed a liberal view of permissive public park use. The camp ground and cabins were established to fill a need not otherwise available. Some of the cabins are regularly rented to students attending Black Hills State College at modest rates. Under the circumstances, we conclude that the City of Spearfish has the implied power to maintain and continue to operate its tourist camp and cabins as an incident to its public park system as it has done for the past 45 years. The possible expenditure of public funds to maintain, improve, or expand such facilities is not presently an issue we must decide.

Affirmed.

ROBERTS, P. J., and BIEGELMEIER, J., concur.

RENTTO and HOMEYER, JJ., dissent.

RENTTO, Judge (dissenting).

Cities have no inherent powers and none of the attributes of sovereignty. They are creatures of our constitution and statutes and possess only such powers as these laws give them, together with such incidental or implied powers as are necessary to enable them to perform their authorized functions. Ericksen v. City of Sioux Falls, 70 S.D. 40, 14 N.W.2d 89.

Statutes granting powers to municipal corporations are strictly construed, and any reasonable doubt or ambiguity is to be resolved against the grant. 62 C.J.S. Municipal Corporations § 119; 37 Am.Jur., Municipal Corporations, § 113. The rule of strict construction "follows logically from the judicial viewpoint that charters are regarded as special grants of power, and hence the conclusion is that whatever is not given expressly, or as a necessary means to the execution of expressly given powers, is withheld." McQuillin—Municipal Corporations, 1966 Revised Volume, § 10.18a.

Apparently the parties agree that our cities have not been given express power to operate tourist camps. The majority finds authority for such activity in the power given municipalities to establish, improve and maintain public parks. But our cases, as I read them, are inconsistent with holding such activity to be a proper park purpose.

In LeFevre v. Board of City of Commissioners of Brookings, 65 S.D. 190, 272 N.W. 795, this court said such power extends "to the improvement of tracts as places of recreation and amusement of the public." In City of Vermillion v. Hugener, 75 S.D. 106, 59 N.W.2d 732, this was construed to define a park as being "a pleasure ground set apart for the recreation of the public, to promote its health and enjoyment." It seems to me that the operation of a tourist camp is foreign to what we have said are the purposes of a park.

Accordingly, I would reverse.

HOMEYER, J., joins in this dissent.